# Exhibit 2

# Deposition of Officer Callahan
# October 28, 2013

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

_____

ANGELIQUE MOORE, et al.,    )
                            )
            Plaintiffs,     )
                            )
      vs.                   )   Case No.
                            )   1:12-cv-00490 (BAH)
DISTRICT OF COLUMBIA,       )
et al.,                     )
                            )
            Defendants.     )
_____)


***CONFIDENTIAL***


                Washington, D.C.
                Monday, October 28, 2013
Deposition of:
          MICHAEL CHARLES CALLAHAN,
the witness, was called for examination by counsel
for the Plaintiff, pursuant to notice, commencing
at 9:26 a.m., at the District of Columbia Office
of the Attorney General, Civil Litigation
Division, 441 Fourth Street, Northwest,
Washington, D.C., before Dawn A. Jaques, CSR, CLR,
and Notary Public in and for the District of
Columbia, when were present on behalf of the
respective parties:


-----------------------------------------------------
              DIGITAL EVIDENCE GROUP
          1726 M Street NW, Suite 1010
              Washington, DC  20036
                (202) 232-0646

APPEARANCES:

On behalf of the Plaintiff:
AJA P. SAE-KUNG, ESQ.
JASON D. WALLACH, ESQ.
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
PHONE:  (202) 420-4809
FAX:    (202) 420-2201
EMAIL:  saekinga@dicksteinshaprio.com
        wallachj@dicksteinshaprio.com

On behalf of the Defendant:
ROBERT A. DeBERARDINIS, JR., ESQ.
D.C. Office of the Attorney General
Civil Litigation Division
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C.  20001
PHONE:  (202) 724-6642
FAX:    (202) 741-8895
EMAIL:  robert.deberardinis@dc.gov

Page  2

I-N-D-E-X

WITNESS:                     PAGE:
MICHAEL CHARLES CALLAHAN
    Examination by Ms. Sae-Kung ........   4
    Examination by Mr. DeBerardinis ....  108


        E-X-H-I-B-I-T-S

EXHIBIT:       DESCRIPTION:        PAGE:
No. 1   Arrest Record Summary ......... 44

No. 2   Office of Police Complaints,
        Officer/Complainant/Witness
        Statement ................... 62

No. 3   MPD Internal Incident-Based
        Event Report, Report No. 11044056   99

Page  3

P R O C E E D I N G S

Whereupon,

        MICHAEL CHARLES CALLAHAN,

was called as a witness, after having been

first duly sworn by the Notary Public, was

examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MS. SAE-KUNG:

    Q   Good morning, Officer Callahan.  I'm

Aja Sae-Kung.  I am attorney for the Plaintiff.

        Can you please tell us your full name?

    A   My name is Michael Charles Callahan.

    Q   And can you spell your last name?

    A   Yeah, C-A-L-L-A-H-A-N.

    Q   And your date of birth?

    A   1/29/80.

    Q   And your current address?

    A   I live at 3311 Wyndham, Circle, condo

number 3188, Alexandria, Virginia, 22302.

        MR. DeBERARDINIS:  I'm sorry, I wasn't

paying attention.

        MR. WALLACH:  We'll designate it

Page  4

confidential.

        MR. DeBERARDINIS:  Yeah, I would

designate that as confidential.  You don't want to

be giving out your address.

        THE WITNESS:  It don't matter.  I'm

moving soon anyway.

        MR. DeBERARDINIS:  I'm sorry, I was slow

on this.  Okay, I apologize.

        BY MS. SAE-KUNG:

    Q   Approximately now tall are you?

    A   Around 5'9".

    Q   And how much do you weigh?

    A   Around 174.

    Q   And are you currently employed by the

Washington, D.C. Police Department?

    A   Yes, ma'am.

    Q   What is your current position?

    A   I'm an investigator assigned to the

7th District detective's office.

    Q   And you mentioned that you are moving

soon?

    A   Yes.

Page  5

Pages  2  to  5

1    Q   And where are you moving to?
2        MR. DeBERARDINIS:  Just the city.
3        THE WITNESS:  Boston, Mass.
4        BY MS. SAE-KUNG:
5    Q   And are you married?
6    A   No.
7    Q   And what's your badge number?
8    A   Right now it's INV-1763.
9    Q   What does the INV stand for?
10   A   Investigator.
11   Q   How soon will you be moving?
12   A   I'm not sure.  Approximately in a month.
13   Q   And when you move, you'll be terminating
14   your employment with D.C.?
15   A   Yes.
16   Q   How long have you been with MPD?
17   A   Almost nine years.
18   Q   And have you ever given sworn testimony
19   before?
20   A   Yes.
21   Q   When?
22   A   Hundreds of times.

Page 6

1    Q   We're just going to go over the basic
2    rules just as a refresher.
3        If you do not understand question,
4    please stop me and state that you don't
5    understand, otherwise I'll assume that you
6    understand the question and your answer is
7    accurate.
8        The court reporter is transcribing
9    everything, so of course if you can answer with
10   verbal answers, please do.  She can't translate or
11   transcribe gestures.
12       It's also important that we don't speak
13   over each other.  You should wait until I finish
14   the question before you answer, and I will do the
15   same.
16       If your counsel states an objection to
17   one of my questions for the record, that is okay.
18   You can continue to answer the question.  I expect
19   you to continue to answer the question.  If he
20   instructs you to not answer the question, I will
21   ask him as such.
22       If you need to take a break, just let me

Page 7

1    know.  The only thing I ask is that you don't take
2    a break until after I've asked the question and
3    you've answered.
4    A   I don't need a break.
5    Q   Okay.  And you understand that you're
6    answering my questions under oath today?
7    A   Yeah.
8    Q   And, finally, is there anything
9    preventing you from giving accurate and full
10   testimony today?
11   A   No.
12   Q   Have you ever been deposed before?
13   A   Yes.
14   Q   And how many times?
15   A   One other time.
16   Q   And what type of case was that?
17   A   It was an assault case.
18   Q   Were you a witness in that?
19       Were you a Defendant in that case?
20   A   I was a Defendant, yeah.
21   Q   As part of your job here?
22   A   Yeah.  It was an off-duty incident.

Page 8

1    Q   An off-duty?  What happened in that
2    incident?
3    A   I was involved at a -- I was at a
4    Chinese restaurant when a fight broke out, and
5    because I was there, I was actually arrested that
6    night for simple assault.  There was no paper by
7    the U.S. Attorney's Office.  Actually, the arrest
8    record was expunged.
9        Due to that there was a plaintiff
10   involved claiming injuries for emotional distress
11   and battery injuries, so the lawsuit went from
12   there, and I was sued as a law enforcement
13   officer.
14   Q   And when was that exactly?
15   A   2007.
16   Q   What was the resolution of that case?
17   A   The resolution of it is I was found
18   guilty of damages, assault, as well as punitive
19   damages, and emotional distress.
20       So basically they won, and right now
21   it's going through appellate court.
22   Q   And as a result, were there

Page 9

ramifications on the job?  Were you subject to
suspension?

    A   Because of the investigation, I got
conduct unbecoming.  I consumed alcohol with my
weapon on me, so they gave my conduct unbecoming,
and I served a suspension for it.

    Q   How long was the suspension?

    A   Initially it was 30 days, and during my
appeal process, I won 10 days back, so I think the
end result was 15 days suspension without pay.

    Q   And that was back you said in 2007,
right?

    A   Yeah, the incident happened in 2007, but
the whole suspension maybe went through 2008-2009.
It was kind of a lengthy process.

    Q   And that's currently on appeal?

    A   No, no.  The suspension is already taken
care of.

    Q   I'm sorry, the lawsuit itself is on
appeal?

    A   Yes.

    Q   And are you from Massachusetts?

    A   Yes, ma'am.

    MR. DeBERARDINIS:  Congratulations on
the Sox.

    THE WITNESS:  Yeah, we tied it up.

    BY MS. SAE-KUNG:

    Q   Where did you go to high school?

    A   Woburn High School.

    Q   I'm sorry?

    A   Woburn High School.

    Q   Woburn?

    A   Yeah.

    Q   How do you spell that?

    A   W-O-B-U-R-N.

    Q   Okay, like it sounds.
    And where is that in Massachusetts?

    A   It's in Woburn, Mass.

    Q   And did you go to college?

    A   Yes.

    Q   And where did you go to college?

    A   I went to Massachusetts Maritime
Academy.

    Q   And what did you study there?

    A   Environmental facility engineering.

    Q   And do you have a degree from there?

    A   Yeah, Bachelor of Science.

    Q   When did you graduate from college?

    A   2003.

    Q   What did you do after graduating from
college in 2003?

    A   I worked doing engineering for the
Coast Guard as a civilian; and then before I got
hired here, I actually moved home and was working
for my dad doing plumbing, just basically a
laborer while I was waiting to get hired by here.

    Q   And how did you hear about the position
here in D.C.?

    A   I applied to every major city, and D.C.
took me first.

    Q   And what made you decide to become a
police officer?

    A   I always wanted to be a cop.  My whole
family are all police officers at home.

    Q   Where did you receive your police
training?

    A   Here in D.C.

    Q   When did you graduate from the police
academy?

    A   2005.  Around June of 2005, I think.

    Q   How long is that program?

    A   Around nine months.

    Q   And when did you begin with the MPD?

    A   December 2004.

    Q   When did you become an officer after you
graduated?  Was it immediate?

    A   Yes.

    Q   So June 2005?

    A   Yeah.

    Q   And that's the only reason you came to
D.C.?

    A   Yes.  You know what, I'm thinking it
might be August when I graduated.  I'm trying
to -- I forget.  It was sometime around the
summer.

    Q   How long have you been -- how long have
you lived in the D.C. area?

    A   I moved for the job, so I've been

1     here -- December will be nine years.
2        Q   And when you began with the MPD, what
3     was your tile?
4        A   I was a recruit when I first was in the
5     academy.
6        Q   And when you graduated and started
7     working?
8        A   I was an officer.
9        Q   And where were you assigned?
10       A   The 5th District.
11       Q   And have you received promotions since
12     starting in 2005?
13       A   Yes.  I made Investigator in April of
14     this year, 2013.
15       Q   And prior to that?
16       A   Just an officer.
17       Q   Where are you currently assigned?
18       A   The 7th District, detective's office.
19       Q   Are you an investigator now?
20       A   Yes.
21       Q   And the 7th District covers what portion
22     of the city?

Page 14

1       A   Southeast and southwest.
2       Q   And how long have you been assigned
3     there?
4       A   Since April.
5       Q   Can you describe what your job
6     responsibilities are and what you do in your
7     position as Investigator?
8       A   I work out of the detective's office,
9     and I investigate misdemeanor crimes, felony
10     crimes.  Basically everything except for homicides
11     right now and sex offenses.
12       Q   So no sex offenses and no homicide?
13       A   Correct.
14       Q   And going back to when you were an
15     officer, prior to this year, what were your duties
16     as an officer in the 5th District?
17       A   I started out in patrol.  I just
18     answered the radio, went to call for service.
19     From there I went into a vice unit, where I worked
20     drugs, gambling, crimes, prostitution.  And then I
21     left 5D and went to a narcotics special
22     investigations division.

Page 15

1       Q   So when you went to vice, was that
2     separate from the narcotics division?
3       A   No -- well, each district has like a
4     narcotics unit, and then the one I went to was the
5     centralized -- the main drug building.
6       Q   Okay.  So you went from the 5D patrol to
7     the centralized kind of narcotics squad?
8       A   Yeah.
9       Q   Okay.  And so that's city wide?
10       A   Well, the vice unit is in the
11     5th District.
12       Q   Okay.
13       A   And then from there I went to the
14     city-wide narcotics unit, and that's when I worked
15     in the Gun Recovery Unit.
16       Q   And what was your job there as a gun --
17     what were your responsibilities in the Gun
18     Recovery Unit?
19       A   We go out and interdict guns in the
20     city, do a lot of search warrants, work with
21     informants.  We basically try to seize as many
22     illegal guns from the streets and houses from D.C.

Page 16

1     as we can.
2       Q   We'll go ahead and go on to the
3     incident.
4        Do you recall the incident on April 1,
5     2011?
6       A   Yes, ma'am.
7       Q   And can you tell us where the incident
8     occurred?
9       A   Yeah.  We were on Good Hope Road,
10     Southeast, 1400 block.
11       Q   And in your preparation for this
12     deposition, have you had an opportunity to look at
13     either your report from that night or at the
14     statements that you've given to investigators?
15       A   Yeah, I looked at the 163.
16       Q   What's a 163?
17       A   A PD-163 is the arrest report.
18       Q   And when did you look at that?
19       A   I looked at it last week when I met with
20     you -- what was that, on Thursday or Friday?  Last
21     week, and then I glanced at it this morning when I
22     got in.

Page 17

Pages 14 to 17

1  Q   And have you had an opportunity to look
2  at any other documents to refresh your
3  recollection?
4  A   I remember looking at my OPC complaint.
5  When they typed it out for me at the office, I
6  read it over before I signed it, but that was I
7  think last year maybe.
8  Q   So you haven't looked at it since then?
9  A   No.
10  Q   And have you talked to anyone else other
11  than your attorney about the details or facts of
12  what happened on that date?
13  A   No.
14  Q   Have you spoken to any of the other
15  officers involved?
16  A   No.
17  Q   And have you seen the complaints that
18  were filed?
19  A   Not really, no.  I don't think so.
20  Q   Okay, so we're going to go through the
21  events of the day.
22      What was your job title and position at

Page 18

1  the time?
2  A   I was an officer.
3  Q   And what squad or unit were you in?
4  A   I was in the Narcotics Special
5  Investigations -- well, NSID for short -- Gun
6  Recovery Unit.
7  Q   And do you remember what time you
8  started your day that day?
9  A   I don't.
10  Q   How long is your typical shift?
11  A   Around -- in that unit --
12  Q   Or during that --
13  A   Yeah.  In that unit, minimum of 8.  It
14  could be 16.  It depends on what's going on.
15  Q   Do you have an estimate of how long it
16  was that day?
17  A   No, because I know we hit the search
18  warrant pretty late.  Like we waited for the
19  gambling to get up and going before we even hit
20  it.
21  Q   What time would you say it was?
22  A   I'd say maybe 10:00.  I don't know for a

Page 19

1  fact.  It was night.
2  Q   Were you in uniform, or what were you
3  wearing?
4  A   I was wearing plain clothes, but we have
5  vests that say "police" identified on the front
6  and back.
7  Q   Does it have your individual name or
8  badge number on it?
9  A   We have our badges on it.  At least I do
10  on my vest, I have a spot for my badge.
11  Q   How did you get to the scene?
12  A   We drove.
13  Q   What type of vehicle?
14  A   We were in unmarked -- I was in a Chevy
15  Tahoe, because I know we were over in Anacostia
16  Park waiting for this location to get up and
17  running before we hit the warrant.
18  Q   How many people were in the truck with
19  you?
20  A   At least three, four.
21  Q   How many total officers were there?
22  A   Probably around 12, 10 to 12 minimum for

Page 20

1  a search warrant.
2  Q   And so you were there to serve a search
3  warrant?
4  A   Yeah.
5  Q   Who were the other officers that were
6  there?
7  A   Sergeant Sloan was our official; we had
8  Lieutenant Alter, who is also our commanding
9  official; Officer Dossen, Sharpton,
10  Detective Del Po.
11  Q   Del --
12  A   D-E-L, and then space, P-O.
13  Q   Thank you.
14  A   Del Po.  The acting of a warrant was
15  Wooden.
16  Q   W-O-O --
17  A   D-E-N.  I believe Harris.
18      That's all I remember.  There's
19  definitely more than that, but roughly those are
20  the guys I remember.
21  Q   And who was the officer in charge, like
22  the supervising officer?

Page 21

**Page 22**

1   A   The supervising officer was
2 Lieutenant Alter.
3   Q   Who was your immediate supervisor at the
4 time?
5   A   Sergeant Sloan.
6   Q   And he was at the scene that day?
7   A   Yes.
8   Q   Had you worked with Lieutenant Alter on
9 similar assignments prior to that day?
10   A   Yeah, several.
11   Q   What was your role that day in the raid?
12   A   I actually carried the shield, a
13 ballistic shield. I went into the location first.
14   Q   Can you describe what you did when you
15 first arrived with the shield?
16   A   Yeah. We basically arrived, and there's
17 an iron gate, and they tried to shut the iron gate
18 on us. So we were able to pry it open, then we
19 made entry through it, and I came in with the
20 shield.
21       I went through and cleared all the
22 rooms, made sure no one had any firearms or any

**Page 23**

1 threats, and then at that point -- there were so
2 many people in there, we actually ran out of
3 handcuffs. We didn't have enough handcuffs
4 because there was like I think 30 or 40 people in
5 there, and we basically secured it as much as we
6 could.
7   Q   So there was 30 to 40 people?
8   A   Yeah. It's a barbershop, and they had a
9 big gambling game going on in back, and we got
10 intel that there was supposed to be a lot of guns
11 and drugs in there.
12   Q   How big would you say the space was?
13 How big is the shop?
14   A   I'd say maybe three of these rooms
15 combined. Pretty big.
16   Q   I'm not even sure how to estimate that.
17 Just guessing at that. 20 by 20 maybe? 15 by 20?
18 Fairly large, okay.
19       What was the intended plan for the
20 people you were detaining during the raid? What
21 were you going to do with them?
22   A   Based on whatever we found for evidence,

**Page 24**

1 you know, connection with any drugs or weapons in
2 there, certain people would be going or not.
3       At that point, we just get in there and
4 we secure everyone, figure out what we got.
5   Q   But when you say you ran out of
6 handcuffs, so maybe you weren't expecting that
7 many people?
8   A   No, we weren't expecting. It was pretty
9 unsafe what we did because, you know, if there
10 were a lot of guns in there, it could have gotten
11 ugly quick because we were outnumbered easily
12 double or triple.
13   Q   It was a very intense situation?
14   A   Yeah. We had a lot going on. So we had
15 guys that we couldn't handcuff all just come out
16 in the main barbershop area and sit them down and
17 watch them while the rest of us searched.
18   Q   How long did it take for you to execute
19 the search warrant and conduct the raid?
20   A   Are you talking once we got in?
21   Q   Let's go from the car. So once you got
22 out of the truck and you had the shield and you

**Page 25**

1 were going towards the iron gate --
2   A   We were in within less than a minute.
3       The search warrant took forever. It was
4 huge, and we had a lot of people. I'd say several
5 hours.
6   Q   Several hours, okay.
7       Did more officers arrive on the scene to
8 help?
9   A   We had patrol show up at one point.
10   Q   Can you describe -- we've talked about
11 the size. Can you describe just what the store --
12 the configuration of the store itself -- or the
13 barbershop itself and the storefront?
14   A   Yeah. So you pull up, and like I said,
15 there's an iron gate that comes down. It's
16 basically to keep people from looting and all
17 that.
18   Q   Oh, on the front of the store?
19   A   Front, yeah. So basically when that's
20 down, you can't see in. So when we arrived, they
21 tried to shut it on us, and we were able to pry it
22 open, like get something underneath there so they

1  couldn't lock it, get it open, and we made entry
2  through the front door.
3          Once you got in, it's a standard
4  barbershop with chairs on the right side, chairs
5  on the left side, and as you go to the back, you
6  go up to like a little doorway, and that's the
7  outside area.  It's like concrete out there, and
8  that's where the main gambling was going on.
9      Q    So the gambling was going on outdoors?
10     A    Yeah.  It's like contained within the
11 barbershop.  It's like a roof over it, but inside,
12 there was all people inside as well.
13     Q    Like a patio area?
14     A    Yeah, basically, yeah.
15     Q    And when you pulled up, when you said
16 you pulled up to get out of the truck, were you on
17 Good Hope Road?
18     A    Yeah, we pulled right up in front of the
19 barbershop.
20     Q    What are the other buildings on the
21 block?
22     A    There's several -- some kind of stores

Page 26

1  there.  And then there's also like a -- to the
2  left, it's like -- I don't know if it's a home or
3  another store, but there's like a little yard
4  there and stuff.  There's a CSOSA building across
5  the street.
6      Q    A what?
7      A    Court services offender, I think,
8  supervised agency.  It's basically probation for
9  D.C.
10     Q    And can you describe what the traffic is
11 like on Good Hope Road?
12     A    Traffic is -- it's a pretty heavy
13 street, I would say.  At that time of night, there
14 were a lot of cars coming down.
15     Q    So it was busy even late at night?
16     A    Yeah, it's pretty busy, yeah.
17     Q    When you pulled over, did you stop
18 traffic?
19     A    No.  We pulled over to the curb, and we
20 actually ran up.  So we didn't actually pull up in
21 front.  We actually was like maybe -- I'd say
22 maybe 50 yards down, because we didn't want them

Page 27

1  to see us coming, and that didn't work because
2  they saw us coming anyways and they tried to shut
3  the gate.
4      Q    All right.  So you didn't have to stop
5  any traffic?
6      A    No.
7      Q    How long were you in the shop before you
8  came out?
9      A    I'd say at least an hour, hour and a
10 half.
11     Q    What made you come out of the shop?
12     A    I heard Lieutenant Alter.  He was
13 yelling at someone outside, like giving him
14 instructions, and I was -- at that point, I was in
15 the barbershop, searching individuals that were in
16 the barbershop, and I heard him.
17     Q    And when you say you were searching
18 those individuals, what were you doing?
19     A    Looking for contraband on them.
20     Q    Were you patting them down or searching
21 their pockets?
22     A    Searching their pockets.

Page 28

1      Q    And were they already handcuffed or
2  restrained?
3      A    Some of them were, some of them weren't.
4      Q    Where were you inside the shop when you
5  heard the yelling?
6      A    Right in the like front entrance to the
7  right.
8      Q    And about how long after arriving on the
9  scene did you hear the yelling?
10     A    Like I said, I'd say like an hour at
11 least, hour and a half.  It was a long time.
12     Q    And at that point, were the same 30 --
13 or sorry.
14          How many officers were at the scene at
15 that point?
16     A    I'd say 10 to 12.
17     Q    Were all the suspects or the people in
18 the barbershop still there?
19     A    No.  We were like basically kicking some
20 of them loose.  Get them all identified, run them
21 for warrants, and then if they were free of any
22 contraband or anything like that, we would just

Page 29

Pages 26 to 29

1 send them out.
2    Q   And when you sent them out, they just
3 would disperse on the street?
4    A   Yes.
5    Q   Onto Good Hope Road?
6    A   Yeah, I'm not sure where they went from
7 there.
8    Q   How many officers remained inside the
9 shop when you went outside?
10    A   I went outside, and Lieutenant Alter was
11 out there, I know Sharpton was out there and
12 Dossen.  Because we heard Lieutenant Alter
13 yelling, so we went outside to see what was going
14 on.
15    Q   Can you describe the yelling?
16    A   He's got a very distinguished voice.  He
17 was just like basically instructing someone to get
18 away, that's all I heard, and then I came outside.
19    Q   So outside of the shop when you came
20 out, it was Sharpton, Dossen, Lieutenant Alter?
21    A   Yeah.
22    Q   So probably four officers outside?

Page 30

1    A   Yeah.  I know I came out first.
2    Q   Okay.
3    A   And at some point, they came outside.
4    Q   And when you came outside -- describe
5 the space in front of the shop.
6    A   It's a sidewalk.  So if you have a
7 store, I'm facing you, my back is towards like the
8 street, Good Hope Road, and there's like sidewalk,
9 like shops, and to the left is like a little rock
10 wall with like grass up top.
11    Q   And if you're standing on Good Hope
12 Road, is the sidewalk a really broad sidewalk or a
13 narrow sidewalk to the storefront?
14    A   Just an average sidewalk I'd say.
15    Q   Can you give me approximate feet?
16    A   Not really.  I mean, if I had to guess,
17 I would say 5 feet maybe, 6 feet.
18    Q   At that point, was it roped off or taped
19 off?
20    A   No, it wasn't, no.
21    Q   Were you preventing people from coming
22 in the scene from down the street?

Page 31

1    A   Yeah, no one was allowed to come in.
2 That's what Lieutenant Alta was basically -- he
3 shows up, he's like our commander official on the
4 scene and makes sure, you know, once we start
5 calling for transcript, make sure transport comes.
6       But he was out front, and he wasn't
7 letting anyone come in.  I remember like when we
8 were sending people out, he was asking us did we
9 run him for warrants and all that, and we were
10 like, yeah.  So he's basically controlling the
11 front of the storefront, make sure no one is
12 coming or going.
13    Q   Do you remember how many people you
14 transported that night as part of the raid?
15    A   Don't remember.  When I got caught up on
16 this incident, then I had to leave and go deal
17 with this and do paperwork, so I was basically
18 taken out of the whole search warrant.
19    Q   And when you say you stepped out of the
20 shop, did you step onto the street or the
21 sidewalk?  Where were you?
22    A   I was out on the sidewalk next to one of

Page 32

1 our vehicles at that point.
2    Q   And when you say that Lieutenant Alta
3 has a distinctive voice, was his yelling urgent?
4    A   It was enough for me to catch my
5 attention, because he's kind of a loud guy, but he
6 was like yelling at someone to keep moving, that's
7 all I heard, and then I came outside and I seen
8 what he was doing.
9    Q   Other than him yelling, did it appear
10 that anyone else was taking action to address the
11 person he was directing his yelling at?
12    A   No.  Like I didn't know who he was
13 talking about.  Like I heard him yelling, so
14 that's when I came out.
15    Q   Okay.  And then what did you do next?
16    A   I get outside, and then the individual,
17 he was just hanging out on his bike, and he was
18 just sitting there, and he was mouthing off to
19 Lieutenant Alter.  Lieutenant Alter was telling
20 him keep moving.
21       You know, at that point, we deal with
22 that all the time.  It's not a big deal.  Like I

Page 33

1  said, he was just kind of being mouthy.  I thought
2  maybe he was drunk or something.  It was kind of
3  late.
4        Like I said, Lieutenant Alter gave him
5  verbal commands to leave the area several times,
6  and then I remember he said -- then he came over
7  with a cell phone.  He wanted -- he said, "My
8  mother wants to talk to you," Lieutenant Alter.
9  Lieutenant Alter basically was like -- I don't
10 know exact verbiage, but it was like, "I don't
11 need to talk to your mother.  I'm handling
12 something here."
13       Then he made some comments to myself.
14 He like basically said he'd kick our ass, made
15 some comment like fuck you or something like that,
16 which is not a big deal, happens every day.
17       Then eventually his mother came down
18 when he was yelling at him, and she was yelling at
19 him telling him to come back up the street.  You
20 know, she was actually apologizing to us saying
21 she doesn't know why he's acting like this.
22       You know, he was told to be quiet

1  several times, because at that point it's night.
2  And then he said, "Fuck you, faggots, I'll kill
3  your ass," and at that point I took it as a
4  threat, I went over and I grabbed him.
5    Q   So prior to that, did you say anything
6  to him when he was directing any of this at you?
7    A   I don't think so.  I may have said, you
8  know, keep going or whatever, but Lieutenant Alter
9  was doing most of the talking.
10   Q   And when you came out and you saw
11 Lieutenant Alter and Mr. Moore, Eric Moore, on the
12 bike, how close were they?  Were they close?  Were
13 they standing close together?
14   A   He was circling on his bike.
15   Q   Was he circling like tight circles?
16   A   Like just kind of on the curb.
17   Q   Was he riding on the sidewalk?
18   A   Yeah, he was on the sidewalk, he was in
19 the street at one point.  The only time I saw him
20 get up close to Lieutenant Alter is when he came
21 up with his phone and said his mother wanted to
22 talk to Lieutenant Alter.

1    Q   And at that point -- so you saw him --
2  you saw the exchange about the phone?
3    A   Yeah.  He came up with his phone, said
4  my mother wants to talk to you.
5    Q   And he was off of the bike at that
6  point?
7    A   No.  He rode up on his bike.
8    Q   He rode up on the bike?
9    A   Yeah, and he was kind of like circling
10 on his bike, and he had the phone in his hand.
11   Q   So he was kind of riding with one hand?
12   A   Yeah.
13   Q   Okay.  And at that point, did
14 Lieutenant Alter, did he seem alarmed or
15 threatened with him coming up to him?
16   A   No, but he was pretty vocal, like, "We
17 have an investigation going on, you need to leave
18 the area or else you're going to be in trouble
19 here," you know.
20   Q   Had you seen Mr. Moore before that?
21   A   Never seen him.
22   Q   And before his mother arrived, had you

1  ever seen her before?
2    A   Never.
3    Q   Can you describe Mr. Moore's appearance,
4  his age, his build?
5    A   I forget, but I remember he was a black
6  male.  I think he was kind of skinny, scrawny.  I
7  definitely was bigger than him, I know that, but I
8  couldn't pick him out of a lineup right now.  I
9  don't even remember what he looks like too much.
10   Q   You say you're bigger than him.  About
11 how much do you think he weighed?
12   A   I have no idea.
13   Q   Do you remember his height?
14   A   I know -- I'm pretty sure I was taller
15 than him.  I just remember him being pretty skinny
16 and frail.
17   Q   How tall are you?
18   A   I'm 5'9".
19   Q   Do you remember what he was wearing?
20   A   Not off the top of my head, no.
21   Q   Or what type of bike he was riding?
22   A   I mean, it was like a BMX style bike.

1  It wasn't a mountain bike or anything.
2     Q   And then going toward the phone, where
3  Lieutenant Alter decided not to get on the phone,
4  about how long did it take between him deciding
5  not to get on the phone and Eric Moore's mother
6  showing up?
7     A   Several minutes, I mean 5 minutes,
8  because he just kind of was hanging on the side.
9  There were some other people out there, too, and
10 he was kind of getting a rise out of them by being
11 mouthy with us.
12    Q   And the other people were where?
13    A   They were like on the curb area up the
14 street a little bit, and he was kind of making
15 jokes and trying to get like a little rise out of
16 everyone out there.
17    Q   So he was making jokes.
18        And when you say they were up the street
19 a little bit, and we've talked about the
20 storefront, and you mentioned -- is it to the
21 right where the stores are, or to the left where
22 you said the house and the yard was?

Page 38

1     A   If you're looking at the store, on the
2  left where the yard is.  So if I'm looking at the
3  store, it would be to my left.
4     Q   And about how many people were out
5  there?
6     A   There was like three to four people.
7  People were trying to walk by, and we were
8  instructing them, like from the get-go, like they
9  need to go around, and that's when I was -- then I
10 was inside searching, doing all that, and that's
11 when Lieutenant Alter was basically keeping the
12 traffic going around and have no one stop in front
13 of the store while we were doing this, because
14 people tend to get nosey, want to know what we're
15 doing.
16    Q   But you didn't employ any type of crowd
17 control, like tape or cones or --
18    A   I don't believe there was any tape or
19 anything out there, no.
20    Q   And when you said you came out of the
21 shop because you heard Lieutenant Alter yelling,
22 where was he?  Was he on the sidewalk or the

Page 39

1  street?
2     A   Sidewalk.
3     Q   Was he right in front of the shop?
4     A   Yeah, he was in the immediate area in
5  front.
6     Q   And when you said that Mr. Moore started
7  yelling at you, what did you do in response?
8     A   Just shook it off.  I'm used to it.
9     Q   Did you have any contact with Mr. Moore
10 at that point?
11    A   No.  The only contact I had was actually
12 when I went up and grabbed ahold of him.
13    Q   And when you say you grabbed him, what
14 did you -- how did you grab him?  Can you describe
15 that?
16    A   I went up and I grabbed him by the arm,
17 like a firm grip.
18    Q   And was Ms. Moore there already, his
19 mother?
20    A   Yes.
21    Q   Do you remember what she was wearing?
22    A   No.

Page 40

1     Q   And can you describe Ms. Moore's build?
2  Do you remember?
3     A   Don't remember.
4     Q   Do you remember if she was taller than
5  you?
6     A   No, not really.
7     Q   And you said it was about five minutes
8  before she arrived on the scene?
9     A   Five, ten minutes.  It wasn't like right
10 away, because he was out there for a while like
11 riding around and just basically saying stuff to
12 us, so --
13    Q   A while meaning how -- a while that you
14 saw him outside once you came out of the shop?
15    A   Yeah.  I'm saying I don't know exact
16 time, but I'd say 10, 15 minutes maybe.
17    Q   Did you see her arrive?
18    A   Yes.
19    Q   How did she get there?
20    A   She came walking down the street from
21 when I saw her.  I don't know if she drove and
22 parked, but she was walking when I saw her.

Page 41

Pages 38 to 41

## Page 42

1  Q   And where were you when she came walking
2  up?
3  A   I was out front.
4  Q   Out front of the shop?
5  A   Yeah.
6  Q   Did she come to the shop?
7  A   She actually came to him trying to get
8  him out of there, grabbing him by the arm, because
9  he was mouthing off to us, and she was like, you
10 know, leave them alone.
11     And then she came up to us and
12 apologized.  She was like, "I don't know why he's
13 acting like this."  She's like, "I'm trying to get
14 him out of here."  I'm like, "Yeah, just get him
15 out of here because this has nothing to do with
16 him."
17     Q   And at that point, you guys were
18 standing in front of the shop?
19     A   Yeah.  I was actually leaning up against
20 the car at that point.
21     Q   When you were leaning up against the
22 car, were your duties inside the shop done?

## Page 43

1  A   What's that?
2  Q   Were your duties inside the shop done?
3  A   No.  I mean, I was outside just watching
4  what's going on because I didn't want to leave
5  Lieutenant Alter out there with some guy riding
6  around on a bike like that saying things to him,
7  so I'm just kind of like watching him, watching
8  his back.
9      Q   Did he seem threatened?  Did
10 Lieutenant Alter seem threatened by Mr. Moore's
11 presence?
12     A   I can't tell, but, I mean, I'm not going
13 to leave him out there.  We've got a lot going out
14 there, and it's nighttime.  So I don't know, maybe
15 one of the guys inside the barbershop called and
16 said, hey, we're all here, can you come by, you
17 know, do something so we can get out of here.
18     So at that point, it's just a safety
19 issue.  You know, I wasn't really alarmed by his
20 behavior.  He was kind of just acting like a fool.
21     Q   And when Ms. Moore arrived at the scene,
22 was she alone?

## Page 44

1  A   Yeah, I saw her by herself.
2  Q   Do you recall anyone else arriving at
3  the scene related to the Moores or related to --
4  A   She was by herself from what I saw, but
5  there were people up the street that kind of were
6  standing back, but she actually approached.
7  Q   Can you describe about how far is it
8  from the shop to the yard next door?
9  A   It's pretty close, so maybe that wall
10 away.  I mean, it's adjacent, next to it, so --
11 Q   Do the buildings touch?
12 A   Don't know.  Possibly.
13     MS. SAE-KUNG:  I'm going to give you an
14 exhibit.
15     (Callahan Deposition Exhibit 1
16     was marked for identification.)
17     BY MS. SAE-KUNG:
18 Q   Do you recognize this document?
19 A   Yeah.
20 Q   What is it?
21 A   This is the second page to the PD-163,
22 which is the Arrest Report.  I actually wrote the

## Page 45

1  narrative, then I signed my name and have my badge
2  on the bottom of it.
3  Q   So you drafted this note?
4  A   Yes.
5  Q   And when did you draft it?
6  A   What's that?
7  Q   When did you draft it?
8  A   That night.  So on here it says the 2nd.
9  Q   Okay.
10 A   Because it happened late at night.
11 Q   So carried over to the next day?
12 A   Carried into the next morning.
13 Q   So that representatives your narrative
14 of the entire story?
15 A   Yeah.  163 is basically a brief synopsis
16 of the Arrest Report, what happened.  A brief
17 statement of the facts, that's what it's called.
18 Q   Okay, great.  What other documents do
19 you have to fill out when you arrest someone?
20 A   163, they do a 251, 252.  Then they also
21 do a -- what's it called -- like a book informer,
22 256.

Q   So can you tell me what the difference is between -- what's a 251?

A   251 is just an incident report, incident offense report that we take.

Q   And who fills that out?

A   Anyone can do it.  Usually like in these kind of arrests, we just divvy up the paperwork, and people just do different portions of it.

Q   And for a 252, what's that?

A   It's the same report.  It's just a continuation.  Like there's certain things that we can't put in a 251 because it's a public document, so like Social Security number stuff like that we'll put in the 252.

Q   So the 251 is a public document?

A   Yeah.

Q   252 is more of an internal document --

A   Internal, yes.

Q   -- where you can put more information on?

A   Yes.

Q   And then the 256?

A   Yeah.

Q   At any point during Lieutenant Alter and Mr. Moore's exchange, did Lieutenant Alter signal for any assistance or backup?

A   No, I didn't get involved until he threatened me, so it wasn't like Lieutenant Alter was like you need to make an arrest or anything.  Once he threatened me like that, that's when I walked over and I grabbed him.

Q   What did he say in the threat?

MR. DeBERARDINIS:  Asked and answered.  You can answer.

THE WITNESS:  Something along the lines, "Fuck you, faggots," or something like that, "I'll kill your asses."

BY MS. SAE-KUNG:

Q   And "I'll kill your asses" is what rose to what you thought was a threat?

A   Yeah, like he's going to hurt me.

Q   Prior to that, did you feel threatened?

A   No.  He was just making comments, swearing at us.  Like I said, I'm used to that.

A   Yes.

Q   Is what?

A   That's basically like an on scene.  It's called a quick booking form.  Basically it's all the pertinent information for the Defendant, name, address, offense, charge, location, all that.  So basically when you get back and you start the arrest report, you get all the information on it.

Q   And you fill out the 256, the quick booking form, at the scene?

A   Yeah, it's done at the scene.  Sometimes it's done at the cell block.  It depends on the circumstances behind it.

Q   And did you fill out a 256 that evening?

A   I'm not sure if I did or not.  I know a lot of times when we do -- because we're like a specialized unit, like patrol will come and they'll do the 256 for us, but I'm not sure who did it that night, whether it was just someone sitting around.  It's basically just done by anyone.

Q   And you were the arresting officer?

It comes to a point, when you're going to start threatening me, that's where I'm going to take action.  I'm not going to allow you to sit there and say you're going to kill my ass.  If I allowed that to go on, then the streets will get really out of hand.  You know, you've got to draw the line at some point.

Q   And when he said that, where was he standing?

A   He was over by the -- adjacent to the barbershop by the rock wall.  There's like a wall there, and there's a yard, and there's like a building.  I'm not sure if it's a house or not.

Q   Was he on the sidewalk, or on the yard?

A   I'm not sure.  I don't know.  I believe he's -- I'm not sure.  I don't know.  I don't remember if it's on the grass or on the sidewalk.  I don't remember.

Q   And where were you standing?

A   Like my back was towards Good Hope Road.  I think there's a set of stairs there actually.

Q   Set of stairs --

1    A   Like leading from like the sidewalk into
2  the yard where the grass is.
3    Q   Okay.  Was his mother there at the
4  time this --
5    A   Yeah, I didn't see her, but she was
6  right there because she ended up grabbing me, like
7  my shoulder from behind.
8    Q   So she grabbed you when?
9    A   I grabbed him, and I was going to put
10  him in handcuffs, and that's when she intervened
11  and grabbed ahold of me and started pulling on me.
12    Q   When you made the threat --
13    A   I didn't make no threat.
14    Q   When he made the threat, where were you
15  standing?
16    A   I was standing up against the car by
17  like right at the curb and the street.
18    Q   But you weren't arm's length away?
19    A   No, no.  I was leaning up against the
20  car like just kind of like watching what's going
21  on, and that's when he said that to me, and I was
22  like, all right, that's enough, you're not going

Page 50

1  to threaten me, and I walked up to him and I
2  grabbed him.
3    Q   So you just walked over?
4    A   Walked right up to him and I grabbed
5  him.
6    Q   Did you give him any warnings?
7    A   No.  I just grabbed him.
8    Q   Did you say anything else?
9    A   No.
10    Q   Just grabbed him.  How did you grab him?
11    A   I grabbed him by the arm, and then I
12  tried to like turn him around, and that's when the
13  mother grabbed me.
14    Q   Was he facing you when you grabbed him?
15    A   Yeah, he was facing me, yeah.
16    Q   So he saw you coming?
17    A   Yeah.
18    Q   Did Ms. Moore see you coming?
19    A   She must have because she intervened.  I
20  didn't really -- once he made the threat, I was
21  focused on him.  Like I said, it was going on for
22  a while, just a lot of talking going on out there.

Page 51

1    Like I said, she already came and
2  apologized to us, and she kind of walked away, but
3  when I walked up to him and I grabbed him, then
4  all of a sudden she was grabbing me from behind.
5    Q   And how did she grab you?
6    A   She like grabbed me like by my shoulder,
7  like pulling on me, and I had ahold of him, and
8  that's when we all just fell to the ground.
9    Q   And how did you fall to the ground?
10    A   Just fell to the ground.
11    Q   Did you fall forward?
12    A   It was like a pig pile.  Like we kind of
13  just all fell.  It was kind of very awkward.
14    Q   A pig pile?
15    A   Yeah, like when you were a little kid.
16    MR. DeBERARDINIS:  Is that a Boston
17  thing?  I think that's a Boston jargon.
18    THE WITNESS:  I thought that was a
19  pretty generic --
20    BY MS. SAE-KUNG:
21    Q   I don't think I've ever heard that.
22    Did Ms. Moore fall to the ground?

Page 52

1    A   Yeah, I believe so.  Yeah, she did.
2    Q   Did you fall -- were you all like
3  touching when you fell?
4    A   Yeah, we were all kind of like awkwardly
5  like on the ground.
6    Q   In looking at your report, the PD-163,
7  there's no mention of falling in this report.
8    A   Yeah.  I just said he was stopped.
9    Q   Is it normal for you to include contact
10  with suspects or witnesses?
11    A   No, you don't usually put force in like
12  a matter like that.
13    Q   What document would you put that in if
14  there was a use of force?
15    A   If there's a use of force, if it's
16  determined we had to do use of force, we do what's
17  called a UFIR.  I'm not sure of the exact PD form.
18    Q   UFIR?
19    A   U-F-I-R.  It's a Use of Force
20  Investigative Report, I'm pretty sure.  I don't
21  know the PD form.  I should know it.  There's a
22  bunch.

Page 53

Pages 50 to 53

1    Q   How did you manage to get Eric Moore
2   into handcuffs on the ground?
3    A   Once I got him on the ground, then I was
4   able to just get him in handcuffs pretty easily.
5   He didn't resist, didn't fight.  It was pretty
6   simple to put him in handcuffs, stood him up, and
7   we brought him over to the car.
8    Q   Who is "we"?
9    A   Myself, and I know Sharpton was there.
10    Q   So Sharpton helped you get up off the
11   ground?
12    A   Yeah, we kind of like got him off the
13   ground, brought him over to the car, and then we
14   started taking his property off him because he was
15   placed under arrest at that time.
16    Q   Did he have anything on him?
17    A   He had like a belt and personal items I
18   think.  We gave it to his mother.
19    Q   He wasn't armed?
20    A   No, he wasn't.
21    Q   Did you suspect at any time he was
22   armed?

Page 54

1    A   I didn't see anything.  Like when I
2   first came on, I was looking for that because of
3   what we had going on, but he wasn't -- we're
4   trained on like gun recognition, and there's
5   certain things that people do a lot, like
6   subconsciously they do it.  They don't even
7   realize they're doing it.  I was looking for that.
8        He didn't have any signs that he was
9   carrying a firearm, because if he did, I would
10   have approached him and -- you know.
11    Q   So prior to making the threat, given
12   that you're aware and trained to look for
13   particular behaviors, did you feel that he was a
14   threat?
15    A   I honestly didn't.  I thought he was
16   basically clowning around, maybe drunk, because he
17   was just acting -- there was no need for it.  It
18   had nothing to do with him.
19        I understand if we're arresting your
20   brother, your sister, or something like that, you
21   might want to get involved, but he had nothing to
22   do with this whole incident.

Page 55

1    Q   Did you give him a Breathalyzer?
2    A   No, we didn't, no.
3    Q   Did you suspect that he had been
4   drinking after you arrested him?
5    A   Possibly.  I don't know.  I don't
6   remember smelling it once I got him in handcuffs
7   or anything, but his behavior seemed -- I thought
8   maybe he was slow at some point.  He just seemed
9   off, and his mother was apologizing to us saying
10   he's schizophrenic, stuff like that, that he
11   doesn't mean it, can I just take him away?
12        And she had her opportunity to get him
13   out of there, but then when he threatened us,
14   we're not going to take him out of handcuffs and
15   release him at that point.
16        Even when the attorneys called me asking
17   about the case, they were like, you know, would
18   you be opposed if we let him get diverted because
19   this is his first offense.  I said no problem, I
20   maybe had a bad day.  I'm not into ruining
21   people's lives and give them criminal records.
22        So I actually agreed with the attorney's

Page 56

1   office to let them just give him a diversion
2   program and then let him continue on with his
3   life, but now I'm sitting here with a lawsuit.  So
4   I could do it again, probably wouldn't cut people
5   breaks anymore because it looks like it comes back
6   and bites you in the ass somehow.
7    Q   What type of diversion program was
8   given?
9    A   I think it was like he -- I forget the
10   term because they were like asking me if I was
11   opposed.  And I said, you know, I deal with bigger
12   badder fish in D.C.  This kid maybe just acted up,
13   but I'm pretty sure it was just like basically --
14   I don't know, maybe put on probation for a little
15   while, and then it just gets completely thrown
16   out.
17        I don't know, I'm not a lawyer, I don't
18   really know the exact term, but it was some kind
19   of program where it wasn't going to affect his
20   record and his career for the rest of his life.
21    Q   And you would say that night was a
22   pretty high intensity night?

Page 57

Pages 54 to 57

1    A   Yeah, we had a lot going on.  I mean, it
2   wasn't a safe seen.  We probably shouldn't have
3   even been -- done the search warrant if we knew
4   how many people were in there, and it was just --
5   so I'm saying we're -- so I'm dealing with a
6   search warrant, now I have to deal with this guy,
7   and now I have to go leave the scene and go fill
8   out arrest paperwork for this, which, you know, I
9   should have been hanging out with these guys
10   making sure the scenes are right and dealing with
11   them because they had a ton of work to do.  We
12   didn't get out of work until the next morning.
13       This whole thing was more of a nuisance
14   than anything.  We got out late in the morning.
15   It was like -- I want to say 5:00, 6:00 in the
16   morning, because we had thousands and thousands of
17   dollars that we confiscated, and we had drugs.  It
18   was lot, and we had a lot of arrests.
19    Q   Did you go back to the scene?
20    A   No.  I mean, I drove by there plenty of
21   times since and had things over there, but not
22   that night.

                                    Page 58

1    Q   No, I meant that night.
2    A   No, no.
3    Q   So just to recap, how long would you say
4   that you were at the scene?
5    A   I'd say an hour and a half, two hours.
6    Q   From the time that you came out of the
7   barbershop to the time you ended up arresting
8   Eric Moore and putting him in the -- transporting
9   him to the station, about how long did that take?
10    A   That was probably like maybe -- to
11   actually transport off scene, probably 30 minutes.
12   I don't know.  It was a good amount of time.
13    Q   And how did he behave once you put him
14   in handcuffs?
15    A   He started apologizing at that point,
16   and he was pretty quiet, compliant.  It was just
17   like -- it was one extreme to the other, you know.
18    Q   What was he charged with when you
19   arrested him?
20    A   Threats.
21    Q   Did you tell or mention to him what his
22   charges were?

                                    Page 59

1    A   No.  I don't usually tell people.
2    Q   Did you have to -- you did not complete
3   a quick booking form there?
4    A   I don't know if I did or not.  I usually
5   don't, so that's why I'm saying that, just out of
6   caution, but I may have.  If I seen it, I can tell
7   my writing, you know.
8    Q   Did you mention to any of the other
9   officers what he was being charged with?
10    A   No, no.  I mean, at that point, I knew
11   what the charge was because he threatened me.  I
12   don't know -- I don't know -- I don't know what
13   other people -- maybe people thought disorderly, I
14   don't know, because he was interfering with our
15   police investigation.  But when I took police
16   action, it was for threats, but I don't know what
17   other people thought.
18    Q   Did you make any comments to Eric Moore
19   prior to his arrest?
20    A   Prior?
21    Q   Prior to arresting him, did you make any
22   other comments?

                                    Page 60

1    A   I mean, I think I said like just go,
2   man, just leave, like when he was doing on the
3   bike.
4    Q   Did you make any homosexual comments?
5    A   No.  That was pretty amusing when I read
6   that in the complaint, in the police complaint.
7    Q   And then moving on to -- this incident
8   was then investigated by the Office of Police
9   Complaints.
10    A   Yeah.
11    Q   When were you notified of the pending
12   investigation?
13    A   I'm not sure.  It's been a while.  I
14   know I got a letter to appear, and then I got a
15   letter saying that they -- that the complaint was
16   like thrown out, like it wasn't -- basically I was
17   clear of the Complaint.  That's when I got a
18   letter.
19    Q   Was it the same year?  Was it like 2011?
20    A   I don't know the answer to that.
21    Q   Do you remember who conducted the
22   investigation?

                                    Page 61

                                    Pages 58 to 61

Page 62

1   A   She was a female.  That's all I
2   remember.
3       Q   And you haven't reviewed the statement
4   since the investigation?
5       A   No.  Basically when I went in there, I
6   tell what happened.  It's kind of funny, they
7   don't let you type it, but they have to type it,
8   which I thought -- I don't really agree with
9   because it's your statement, but then she let me
10  read it, and then she said if I was fine with it,
11  did I want to add anything or omit anything, then
12  you sign it, so that becomes your statement.
13      Q   I'm going to give you an exhibit.
14          (Callahan Deposition Exhibit 2
15          was marked for identification.)
16      BY MS. SAE-KUNG:
17      Q   Do you recognize that document?
18      A   Yeah, this is the statement that they
19  type up for you.
20      Q   Did you have to -- did you have to --
21  was it sworn testimony or statement?
22      A   I don't believe so, no.

Page 63

1       Q   But you did have a chance to review it?
2       A   Yeah, like when I'm there, yeah.
3       Q   And you signed it?
4       A   Yeah.
5       Q   And then -- we covered most of it.  Let
6   me make sure I'm not missing anything.
7           At any time when she came out of the
8   barbershop, did you go back in to the barbershop?
9       A   I'm not sure.  I don't think so.  I
10  think I came out, and I was basically hanging out,
11  like just monitoring what's going on with
12  Lieutenant Alter and I was sitting by the car, but
13  I may have gone out and came back in.  I'm not
14  sure.
15      Q   Were any of you injured when you fell?
16      A   No.
17      Q   Did you fall on grass or concrete?
18      A   I don't remember that.
19      Q   Were you in the yard or on the sidewalk?
20      A   That's what I was having trouble
21  remembering.  I'm not sure if we were on the
22  stairs, on the grass, or the street.  It was a

Page 64

1   long time ago.  I don't really remember.
2       Q   The yard is elevated from the sidewalk?
3       A   Pretty sure, yeah, there's like a set
4   of -- like a couple of -- like maybe two or three
5   stairs, and then there's like a yard, but there's
6   like a walkway with concrete.
7       Q   And your statement for the OPC contains
8   a recollection of you falling and the three of you
9   falling.
10          MR. DeBERARDINIS:  I'm going to object
11  to the form of the question.  You should refer the
12  officer to what you want to talk about with that.
13  Let him testify as to what it says.
14      BY MS. SAE-KUNG:
15      Q   So you testified here in this statement
16  that the three of you fell on the second page,
17  three paragraphs down.
18      A   Yeah.
19      Q   When you walked up to arrest him, where
20  was Ms. Moore standing?
21      A   I just remember her like -- once I
22  grabbed him, she kind of came over, but I don't --

Page 65

1       Q   Did you feel threatened by her?
2       A   No, because I don't think I even saw her
3   when I approached him.
4       Q   When she grabbed you and made you fall,
5   what prevented you from arresting her for assault?
6       A   Because, you know, she could go to jail,
7   absolutely, but, you know, it's a mom seeing her
8   son getting grabbed and put in handcuffs.  It's
9   probably traumatic experience, she doesn't want to
10  see that, and she was just acting like a mom.
11          So I'm not in the business of just
12  arresting people.  I do have, you know, some set
13  of like -- I mean, I don't know how to say it, but
14  like I understand where people come from, you
15  know.  So at that point, I'm not going to just
16  lock the mother up just to lock her up.
17      Q   How quickly did that happen that you
18  moved from the car to arresting him to where you
19  guys fell?
20      A   It was quick.  I just basically walked
21  maybe 5, 6 feet, grabbed ahold of him, that was
22  the end of it, and then we all just went on the

1  ground.
2      Q    And you say you walked quickly here.
3      A    Yeah.
4      Q    You would describe that as quickly?
5      A    Yeah, like basically -- I didn't run
6  after him.  I just kind of walked over there
7  quickly, I mean.
8      Q    Did you let any of your other officers
9  know that you were going to make this arrest?
10     A    No.  That's what I'm saying, I heard the
11 threat, and then at that point, that was just the
12 threshold of it, and I went over and grabbed him.
13     Q    Do you know if anyone else heard the
14 threat?
15     A    I'm not sure.
16     Q    Were there people still outside on
17 the -- non-police standing outside?
18     A    Yeah, there were several people, but
19 they were like further up the block.  I don't
20 know, maybe 20, 30 yards up the block.
21     Q    They weren't involved?
22     A    No.  Everyone was kind of hanging out

Page 66

1      Q    And you provided your full statement to
2  them?
3      A    Yeah.  What they're doing is they're
4  actually asking you questions too, so then you're
5  answering the questions, that's when they write.
6  That's why I don't like how the way they do it.
7           Like in this statement, they ask you a
8  bunch of questions, and then you're answering,
9  that's why I like -- 163 is just a brief synopsis
10 of what happened, and in this they're hitting you
11 with questions like -- it's like you're in court.
12     Q    And when they draft the statement,
13 you're allowed to review it?
14     A    Yes.
15     Q    Are you allowed to make changes to it?
16     A    Yeah, you can.  They just say like read
17 it, and then is there anything you want me to add
18 or take out, and then you sign it.  That's what
19 they do.
20     Q    Do you remember making any changes?
21     A    No, I don't think so, no.  I think I
22 added stuff, you know, because they hit you with

Page 68

1  being nosey.  I think it was like a Friday night.
2      Q    And what happens if you don't respond to
3  an OPC investigation?
4      A    If you don't, you get written up.  It's
5  like considered like a court no show, just like if
6  I don't show up to court.
7      Q    And what happens when you get written
8  up?
9      A    You can either get suspended, you can
10 get just a written reprimand, but sometimes for
11 discipline it will go in your personnel jacket and
12 will follow you for the rest of your career.
13     Q    So providing a full statement to the OPC
14 investigators is a serious part of your job?
15     A    Yeah, I would say so.
16     MR. DeBERARDINIS:  I'm going to object
17 to the form of the question.
18     BY MS. SAE-KUNG:
19     Q    You take that seriously and provide --
20     A    Yeah, it's an investigation.  I mean,
21 so, yeah, you just give them your statement of
22 what happened.

Page 67

1  more questions like follow-up.  It's all taped, so
2  I'm sure you can get ahold of it.
3      Q    And do you remember what you may have
4  added?
5      A    Not sure.
6      Q    Would you say it was substantive or more
7  just details?
8      A    It was more like detailed.  This is
9  definitely more detailed than the 163, you know.
10     Q    Have you been involved in other OPC
11 investigations?
12     A    Yeah.
13     Q    How many?
14     A    I don't know.  I mean, I've been there a
15 bunch, so I'm not really sure.
16     Q    What type of conduct or occurrences led
17 to the investigations in the past?
18     A    Search warrants and houses, people suing
19 because their door got knocked in, use of force,
20 alleged like excessive force complaints.  I've
21 been there for when drug boys in the neighborhood
22 would file a complaint because you're doing a job.

Page 69

Pages 66 to 69

1   I mean, I've been there several times.
2       Q    And have any of the complaints been --
3   investigations substantiated the complaints?
4       A    No.
5       Q    All of them have been unsubstantiated?
6       A    Yes.
7       Q    When they're unsubstantiated, when
8   they're found unsubstantiated, what happens?
9       A    I'm not sure, to be honest with you.  I
10  don't know.
11      Q    Are you allowed to read the summaries
12  that the investigators produce?
13      A    No.  You get like a generic like
14  letterhead that says in reference to this
15  complaint number, basically -- I'm trying to think
16  of where else some were earlier.  Like it was
17  unfounded or something like that, but it's just
18  like a generic letter.
19          I know just from other people that have
20  been -- like sustained complaint, like when they
21  testify, they've got to disclose that to the
22  attorney, so it comes up in trial.  Like have you

Page 70

1   ever had a OPC complaint that's been sustained for
2   whatever, whatever, and they say yeah.
3       Q    And you have no sustained?
4       A    No.
5       Q    Do the complaints that are the
6   underlying complaints, do they stay on your
7   record, or do they go on your personnel record?
8       A    I believe so.
9       Q    And do you know how many of the
10  complaints were related to use of force or
11  excessive use of force?
12      A    No, because I've been there as a target
13  and I've been there as a witness, and I think they
14  handle it different.
15          So that's what I'm saying.  I've been
16  there a bunch.  I don't know how many times I've
17  been the actual target of it or just a witness, so
18  I'm not sure.
19      Q    Do they tell you whether or not you're
20  the witness or the target?
21      A    Yeah, they do, because I know if you're
22  a target, then you want to see like a union rep.

Page 71

1           I don't know.  Like I said, I know I've
2   been there as a target and I've been there as a
3   witness, but I'd say I've been there as a witness
4   a lot more times than I've been the target of the
5   investigation.
6       Q    Was there a union rep present when you
7   conducted the interview for this investigation?
8       A    I don't know.  I don't think I took a
9   union rep for this, no.
10      Q    And you've had no other substantiated or
11  sustained complaints of excessive force?  None of
12  them were sustained?
13      A    No, not that I'm aware of.
14      Q    And then in 2008, you were involved in a
15  shooting?
16      A    Yes.
17      Q    And can you describe that event?
18      A    Like what do you want to know about it
19  like?
20      Q    Just the background, what happened, when
21  it happened.
22      A    Yeah.  Well, 2008 --

Page 72

1       Q    Do you remember when in 2008?
2       A    No, I don't.  It was -- I want to say
3   springtime.  Basically responding to a call for a
4   domestic violence dispute where a boyfriend had a
5   knife up to his girlfriend's throat in front of
6   her kids.  When I got there, they were screaming
7   and yelling.
8           He actually called her on the phone and
9   said once those police leave, you're dead, I'm
10  going to kill you and your kids.  And then he said
11  something about like to the effect of tell the
12  white officers fuck them, or something like that.
13          So at that point, I'm like he must be in
14  the area because he knows we're white.  So she
15  gave me a look, and I went and looked for him.  He
16  happened to be right behind the house on the fire
17  escape.  I approached him, just a typical domestic
18  assmo, hey, I've got one side, I want to hear your
19  side.  He brandished a knife, came at me, and I
20  used lethal force.  It ended up being a fatality
21  shooting.
22      Q    You said assmo?

Page 73

Pages 70 to 73

1    A   What's that?
2    Q   What did you say?  You said it was a
3    domestic -- I think you used an acronym.
4    A   Domestic dispute?
5    Q   It's okay.  I think that's in the
6    record.
7    A   Yeah.
8    Q   Were you placed on leave without pay or
9    suspension?
10   A   No, I was on admin leave for three days,
11   and then I was put on I think limited duty,
12   limited duty for like three weeks.  I had to go
13   speak to like a psychiatrist and all that, and
14   then I was cleared to go back to work.
15   Q   How long before you were cleared?
16   A   Cleared?  Well, I came back to work
17   after like three weeks, but the investigation --
18   the U.S. Attorney's Office took around a year.  I
19   was working.  It took like a year to finally get a
20   letter of declination, decline to prosecute for
21   it.
22       Then once that happened, the criminal

                                        Page 74

1    aspects order of it, they do the -- MPD does their
2    investigation, and at that point, I had to go in
3    and make a statement to our Force Investigation
4    Team, and I was cleared, justified within
5    department policy, within like two, three weeks
6    after that, but it did take like a whole year.
7    Q   And were you required to attend anything
8    else other than the psychiatric evaluation as a
9    result?
10   A   Yeah.  It's mandatory you've got to go
11   see the psychiatrist like three times, and then
12   because you were involved in a shooting, you've
13   got to go to all these classes where you talk
14   about your feelings and watch some videos.
15   Basically it's like some grief counseling, I
16   guess.
17   Q   And you haven't had to go to any other
18   training or counseling since then related to that
19   event?
20   A   No, no.
21   Q   Have you had any other types of
22   complaints filed against you other than the

                                        Page 75

1    excessive use of force that were sustained?
2    A   Complaints like to OPC?
3    Q   Yes.
4    A   No, I never had a complaint sustained.
5    Q   Are there other systems for complaints
6    that don't go through OPC?
7    A   No.  Just like this, like a lawsuit and
8    all that.
9    Q   How many times have you been a defendant
10   in a lawsuit, a named party in a lawsuit?
11   A   I'd say like three or four, but most of
12   them like I don't --
13   Q   Were they all work related?
14   A   -- I just don't hear anything about
15   them.  They kind of just go away.  What's that?
16   Q   Were they all work related?
17   A   Yes.
18   Q   And have you ever been required to
19   attend anger management or other training as a
20   result of the complaints?
21   A   No.
22   Q   And then talking about training, what

                                        Page 76

1    are the procedures for reviewing and acknowledging
2    department issue directives?
3    A   What's that?
4    Q   What do you do when you get a
5    department-issued directive?
6    A   Oh, they're called like special orders
7    and general orders.  Basically they give it to you
8    and you've got to sign your name acknowledging
9    that you took possession of it and read it, so --
10   Q   Is it in hard copy?
11   A   Yeah, they're hard copies, yeah.
12   Q   And then you sign, is it like a --
13   A   Yeah.  So basically if you break a rule,
14   then they can come back and say, hey, you knew
15   about this because you signed on it.
16   Q   Are there required annual trainings?
17   A   We have annual trainings, yes.
18   Q   Like what?
19   A   Like we go to firearms, we do a lot of
20   stuff on like gay-lesbian transgender training,
21   like handling them, training like that.  That's a
22   big topic we do a lot now.  We do that every year.

                                        Page 77

                                        Pages 74 to 77

1 We do like ethics training.
2     Q   What type of training -- when you say
3 training, what does it entail?
4     A   Well, now you go online, you watch
5 basically like a little PowerPoint, answer some
6 questions, take a little exam at the end of it.
7         And then we do have in-service training
8 where it's around 40 hours of -- you basically go
9 to the academy, and they give you different topics
10 and they talk about things, you have little
11 quizzes.
12     Q   So for the in-service, you take it at
13 the academy?
14     A   Yeah.
15     Q   Do you recall having training on
16 disorderly conduct?
17     A   Yeah, that was a big one.  I think maybe
18 two, three years ago they came out with new
19 disorderly laws and all that.
20     Q   Do you recall what they are?
21     A   No.  I don't really deal with disorderly
22 crimes, so I just remember like they changed a

Page 78

1 couple of them.  Like loud at night, there was no
2 more loud and boisterous.  The new charge is
3 noises at night or something like that after
4 10:00 p.m.
5     Q   Is there training on use of force?
6     A   Yes.
7     Q   And when did you take that?
8     A   In the academy, and we have had it
9 in-service training before.
10     Q   Is it something that's fairly frequent?
11     A   I'd say more so than not, yeah, than
12 other topics, yeah.
13     Q   So have you done it -- is it like once a
14 year?  Every two years?
15     A   I'd say, yeah, maybe every two years,
16 maybe even every year.  It depends.  Like they hit
17 on certain things.  Like at the range and all
18 that, they talk about different uses of force,
19 basically like when not to use certain types of
20 force.
21     Q   And how do they tell you -- I mean, how
22 do they describe what the different uses of

Page 79

1 force -- how do they categorize it?
2     A   They actually have like this little
3 pyramid thing that talks about like aggressive
4 behavior.  It's all subject to the person and the
5 situation.  So basically every situation is
6 different, I guess.
7     Q   And that's usually in-service training?
8     A   Yeah, and then they do it at the range
9 when you qualify.  That's more related to like
10 using your firearm and OC spray and baton.
11     Q   At the gun range?
12     A   Yeah.
13     Q   And OC spray?
14     A   Yes.
15     Q   What's OC spray?
16     A   It's Mace.
17     Q   And have you received training on
18 threats to do bodily harm?
19     A   Yeah, in the academy.
20     Q   Can you describe that training?
21     A   Yeah, they just go over like basically
22 the charge and what it carries in jail and all

Page 80

1 that, which is really irrelevant, the whole charge
2 and how much time it takes in jail because -- I
3 don't know.
4     Q   Why would you say it's irrelevant?
5     A   Because, I mean, when I came here, like
6 you go through the criminal codes, and it's like,
7 okay, you get caught with a firearm, you're going
8 to do a certain amount of time.
9         When I was on Gun, you'd chase hundreds
10 of guys with a gun, get probation.  So it's
11 like I don't even know why we learn about that
12 because that's up to the attorneys.  We're not
13 actually sentencing anyone.  It doesn't make any
14 sense.
15     Q   Okay.  So you're saying they go over the
16 code in terms of their jail sentence?
17     A   Yeah, just like, you know, I look back,
18 and we spent a lot of time on that, we should have
19 done more report writing and everything than
20 learning about car jacking is 35 years in prison,
21 which has nothing to do with our job.  I mean, we
22 present the case, and the attorneys do whatever

Page 81

Pages 78 to 81

1   they want.
2        Q   Do they give you scenarios on how -- so
3   when you're talking about they give you this
4   information about the code and the sentencing, do
5   they give you information on how to determine or
6   make a determination on when the threats reach
7   arrest level?
8        A   I mean, if the elements are there to
9   make an arrest, you can make an arrest, that's
10  all.
11       Q   Do they give you scenarios like here's
12  Case A, and this is what happened, and in this
13  scenario you should do this?  I mean, do they give
14  you --
15       A   They give you scenarios, and then you
16  come up -- you tell them like what you would
17  charge.
18       Q   Do you know what the elements are for
19  threats to bodily harm?
20       A   There would have to be a threat made,
21  you have to feel that the threat -- you know, they
22  can act upon it.

1        Q   So threats made, act upon it.
2            Is it just two?
3        A   Yeah, that's what I would say, yeah.
4        Q   What, if any, are the reporting
5   requirements for threats made against a police
6   officer?
7            So when you do arrest someone for
8   threats made against a police officer, are there
9   any special requirements?
10       A   No.  Just do the arrest paperwork.
11       Q   Do you know if there's a policy or a
12  directive addressing threats and required
13  reporting?
14       A   I don't.  I have no idea.
15       Q   Do you know how many arrests you've made
16  for threats to do bodily harm?
17       A   No idea.
18       Q   Were there a lot?  More than ten?
19       A   I don't know.  I don't think it's that
20  many, no.
21       Q   Not as many as ten?
22       A   No.  I mean, most of my career has been

1   guns and drugs, so --
2        Q   For the times that you have arrested
3   people for threats, were they -- what type of
4   scenarios were they in?  Were they similar to
5   Eric Moore's?
6        A   Basically someone has threatened to hurt
7   me or do something to me.  Yeah, basically same
8   kind of situation.
9        Q   Do you recall if they were armed?
10       A   I don't recall.  I don't think anyone
11  was armed.
12       Q   Or intoxicated?
13       A   Yeah, people have been intoxicated
14  before.
15       Q   But Mr. Moore wasn't intoxicated that
16  night?
17       A   There was no evidence that he was.  We
18  don't have any evidence, but I thought he was just
19  by the way he was acting prior to that, that's why
20  it was just kind of like we're dealing with a
21  drunk guy out here at this point, but he was
22  getting loud and wouldn't go away.

1        Q   How old did you think he was at the
2   time?
3        A   I'd say he's between 18 and 20.  I don't
4   really know how old he is other than the arrest
5   report.
6        Q   So you've done more than one arrest for
7   threats to do bodily harm?
8        A   Yeah, I think so, yeah.
9            MR. WALLACH:  Could you read back that
10  response?
11           (The reporter read back the record.)
12           BY MS. SAE-KUNG:
13       Q   In the other arrest that you have done
14  for threats to do bodily harm, was there physical
15  contact?
16       A   Yeah, probably, yeah.  I'd say so, yeah.
17  I mean, at some point you've got to put handcuffs
18  on someone, so --
19       Q   Well, I mean were the suspects the
20  aggressors?
21       A   Yeah.
22           MS. SAE-KUNG:  All right, I think I'm

1  done for the questioning.
2      MR. WALLACH:  No, no, let's take a
3  break.
4      MS. SAE-KUNG:  Okay, we'll take a break.
5      (A break was taken at 10:40 a.m.)
6      (Resume at 10:50 a.m.)
7  BY MS. SAE-KUNG:
8      Q   So just to follow up on your pending
9  appeal, your civil case --
10     A   Yeah.
11     Q   -- who is the lawyer representing you
12  during the civil case?
13     A   James McCollum.
14     Q   And is he a D.C. --
15     A   He's out of Maryland.
16     Q   Is he your prior attorney?
17     A   Yes.
18     Q   And is it the same person that
19  represented you at the trial level?
20     A   No.  The trial -- the actual civil trial
21  was Harold Martin, Robert Ades' office.
22     Q   Out of what office?

Page 86

1      A   Robert Ades, A-D-E-S.  He just passed, I
2  know that too.
3      Q   And he was also your private attorney?
4      A   Yeah.
5      Q   And then earlier you mentioned that
6  you're moving to Massachusetts?
7      A   Yeah.
8      Q   Why are you moving?
9      A   For a new job.
10     Q   What are you going to do there?
11     A   Massachusetts State Police.
12     Q   Do you already have a position?
13     A   Yeah.
14     Q   When do you start?
15     A   December.
16     Q   Where in Massachusetts will you be
17  moving?
18     A   Boston.
19     Q   Going back to the incident, what made
20  you feel like Mr. Moore could act upon his threat?
21     A   You know, it's late at night, it's a
22  dangerous area over there, and we've got a lot

Page 87

1  going on.  At that point, you know, I don't
2  know any -- you know, I don't know him from Adam.
3  I mean, the way he's acting was a little
4  irrational.  At that point, I don't know if he's
5  on drugs or alcohol.
6      You know, before that he was just
7  swearing at us a lot, which people do, but once
8  you say you're going to kill your asses to me,
9  like towards me, I'm going to act upon that.  I'm
10 not going to find out if you can carry that act
11 out or not.  You know, I don't know what you have,
12 what your state of mind is.
13     So for the safety of myself, I'm not
14 going to let someone say that, and then find out
15 if they can do it or not.
16     Q   And then -- sorry.
17     A   So I take any kind of threat like that
18 personal, and at the end of day, I'm trying to go
19 home at night.
20     Q   And his previous yelling and language
21 was directed at Lieutenant Alter?
22     A   Yeah, and then towards us as well.  It

Page 88

1  was more swearing and getting people -- like a
2  little rise out of the crowd, but then when he
3  threatened me, I take that serious, and that's
4  when I engaged him.
5      Q   And why -- when you said at us, who is
6  the "us"?
7      A   Like Sharpton was out there, Dossen.  He
8  was just making comments.  I think he was making
9  fun of Dossen's accent because he's African.
10     Q   What did Dossen say that he heard his
11 accent?
12     A   I'm not sure.  I just remember him like
13 joking around about Dossen because of his accent.
14 If you meet him, he's got a very distinguished
15 African accent.
16     Q   Did Dossen speak to him?
17     A   No.  I think Dossen was just talking out
18 loud.  I just remember him joking around about his
19 accent.  Like I said, this went on for a while.
20 It wasn't like I exit, he said something, go grab
21 him.  It wasn't anything like that.  It was a lot
22 of just letting him shoot his mouth off and ride

Page 89

Pages 86 to 89

1  around and just be a clown basically, and then he
2  threatened me.
3      Q   And when he made the threat, did he make
4  any other physical changes?
5      A   No.
6      Q   Did he make any advances towards you?
7      A   No.  He was over by the wall.
8      Q   So he'd been yelling and cursing and
9  using profane language for how long?
10     A   I'd say 10 minutes, 15 minutes.
11     Q   And then he made the statement directed
12 at you?
13     A   Yeah.
14     Q   Without you saying something prior to
15 him?
16     A   Yes.
17     Q   And he didn't make any advances towards
18 you?
19     A   No, he didn't.
20     Q   Didn't take any aggressive stances
21 towards you?
22     A   No.

Page 90

1      Q   Just the threat?
2      A   Yes.
3      Q   Why do you think he directed his
4  comments at you?
5      A   Because I was standing right there.
6      Q   Were there any other officers between
7  you and him?
8      A   Yeah.  Like Sharpton was out there, but
9  he was like looking right at me, and then he
10 pointed, and that's when he was like something
11 about I'll kick all your asses, something like
12 that.
13     Q   And he said I'll kick all your asses?
14     A   I forget the exact term.  I wrote it in
15 the statement, but it was like, "Fuck you,
16 faggots.  I'll kill all your asses."
17     Q   And you took that as just you?
18     A   I mean, yeah, I was involved in it, so I
19 took it as a threat on me, so that's why I
20 approached him.
21     Q   And none of the other officers reacted
22 in the same way?

Page 91

1      A   No.  I mean, right when he said it, I
2  went right over to him, so --
3      Q   And when you walked over towards him,
4  did he make an attempt to flea?
5      A   No, he didn't.  Like I said, it happened
6  quick, and I grabbed ahold of him.  If he ran, I
7  would have ran after him.
8      Q   Did he attempt to break loose when you
9  grabbed him?
10     A   No.
11     Q   Did he resist arrest in any way?
12     A   No.  He was on the ground, he was
13 complaint, I put the handcuffs on him, and it was
14 quick.
15     Q   And when you put the handcuffs on him,
16 you were on the ground as well?
17     A   Initially I was trying to put the
18 handcuffs on him right when I grabbed him, and
19 then that's when the mother grabbed me, and we all
20 went to the ground, and then I got handcuffs on
21 him pretty quick.
22     Q   Did you have to rise up from the ground?

Page 92

1      A   I don't remember.  I don't know if I was
2  on the ground.  I just know it was without much of
3  an incident, you know.
4      Q   Going back to your statement from the
5  OPC investigation.  On the second page, in the
6  third paragraph you say, "I never intentionally
7  tackled Ms. Moore to the ground."
8      A   Uh-huh.
9      Q   Did you intentionally tackle Mr. Moore?
10     A   No.  That was a reference to a follow-up
11 question from OPC like, because I guess that was
12 part of the complaint, that I tackled him.  I was
13 like, no, I didn't tackle no one.  Basically we
14 all just fell.
15     Q   And when you did -- when you all fell,
16 Mr. Moore -- what did Mr. Moore do?
17     A   When he fell?
18     Q   When you all fell?
19     A   We were on the ground.
20     Q   Did he say anything?
21     A   I don't remember right now.
22     Q   Did he make any more threats?

Page 93

Pages 90 to 93

1    A   I don't believe so.
2    Q   You were able to just put handcuffs on
3 him?
4    A   Yeah.  Like I said, once the handcuffs
5 were on him, he started apologizing, became a new
6 person.  I think he realized like his behavior,
7 and then he lost the situation.
8        You know, at that point he was joking
9 around, thought he was funny, and then he
10 threatened -- because I think with him saying all
11 the stuff he was saying, he thought we weren't
12 going to do anything, and then when he threatened
13 me, that's when I engaged him, so -- he was crying
14 at one point on the scene.
15    Q   He was crying?
16    A   Uh-huh.  He was apologizing, the mother
17 was apologizing.  That's why I think it's funny
18 that we're sitting here with a lawsuit.
19    Q   Do you remember the last time you placed
20 someone under arrest for threats to do bodily
21 harm?
22    A   I don't, ma'am.

1    Q   Has it been since the April 2011 event?
2    A   No idea.
3    Q   When Eric was making -- when Mr. Moore
4 was making all of these statements and using
5 profane language, did you think that was
6 disrespectful?
7    A   Yes, but it's common.
8    Q   Have you received training on how to
9 handle disrespectful or foul language?
10    A   Yeah.  Basically you're told to brush it
11 off, you know, and they told us to have hides as
12 thick as leather.  That's what they tell us.  So,
13 I mean, we take a lot of verbal abuse on the
14 street every day, so that's why, you know, some
15 jurisdictions might act different, but I've been
16 called every name in the book, so it doesn't
17 really bother me.
18        That's what I'm saying.  Like I'll
19 tolerate that.  You want to get mouthy and show
20 off, you can do it, I'll tolerate that, but when
21 it came to the threat, that's when I've had
22 enough.  You're not going to threaten me because

1 I'm not going to sit there and find out if you can
2 pull off the threat or not.
3    Q   So you have lots of different verbal
4 insult and disrespectful language in the course of
5 your job on a regular basis?
6    A   Yes.
7    Q   But not normally threats?
8    A   No.  If someone threatens me, they're
9 going to jail.  Police officers get killed every
10 day.  I'm not going to find out if they can do it
11 or not.
12    Q   And earlier you were designated as a
13 30(b)(6) witness, the official witness for D.C. on
14 the event, in this incident.
15        Did you do anything to prepare as the
16 witness for this?
17        MR. DeBERARDINIS:  I'm being a wise guy.
18 Other than being there and being the arresting
19 officer?
20        MS. SAE-KUNG:  Well, he's a 30(b)(6)
21 witness.  You would prepare a 30(b)(6) witness.
22        MR. DeBERARDINIS:  Okay, he can answer.

1        THE WITNESS:  I just looked at the 163
2 for like maybe two minutes before I came in here.
3        BY MS. SAE-KUNG:
4    Q   So today?
5    A   Yeah.
6    Q   And 163 is the police report?
7    A   Yeah, the arrest report.
8    Q   The one you prepared?
9    A   Yeah.
10    Q   Did you talk to anyone else about this
11 incident?
12    A   No.  The only thing I talked to Sharpton
13 was like that he was telling me that
14 Mr. DeBerardinis was trying to get ahold of me.
15 That's the only thing I talked to Sharpton about
16 this.
17    Q   So you spoke to Officer Sharpton?
18    A   Yeah.  He just said, hey, he's trying to
19 get ahold of you to come in, because I had to
20 reschedule a couple times in the last week or two.
21    Q   And when did you speak to
22 Officer Sharpton?

Page 98

1    A   Like I said, maybe two weeks ago when
2  initially he came in.
3          MR. DeBERARDINIS:  I can't answer.
4          BY MS. SAE-KUNG:
5    Q   Are you and Officer Sharpton in the same
6  unit?
7    A   We used to be.  No.  I'm in the
8  detective's office, he's still in the gun unit.
9    Q   So he called you?
10   A   Yeah.
11   Q   During the incident, why did
12  Lieutenant Alter start yelling at Mr. Moore?
13   A   Because he was --
14         MR. DeBERARDINIS:  Object to the form of
15  the question.  You can answer.
16         THE WITNESS:  Later on I thought it was
17  just because, from Lieutenant Alter, that he's
18  handling the scene trying to make it safe, and
19  this guy keeps coming by, stopping on his bike in
20  front of our search warrant like trying to look
21  in, at the point he doesn't know what he's doing.
22         So that's when he was like, hey, we've

Page 99

1  got something going on here.  Actually, he could
2  have been locked up for impeding the investigation
3  right there.  So he's telling him move on because
4  he has no business there.  He had nothing to do
5  with the search warrant, you know.
6          MS. SAE-KUNG:  I'm going to give you one
7  other exhibit.
8          (Callahan Deposition Exhibit 3
9           was marked for identification.)
10         BY MS. SAE-KUNG:
11   Q   Do you recognize that exhibit -- I'm
12  sorry, this document?
13   A   Yeah.  This is the 251 and 252.
14   Q   And what are the 251 and 252 again?
15   A   251 is the incident report, and 252 is
16  just like a supplemental part of it where there's
17  more information that's internal.
18   Q   And who prepares this report?
19   A   Someone that night did it.
20   Q   But you didn't do it?
21   A   No.  If I'm doing a 163, technically, I
22  don't usually do the 251, 252.  Someone else is

Page 100

1  doing that.
2    Q   So it's pretty typical for someone else
3  to do it?
4    A   Yeah.  And sometimes like if I do a 163,
5  like they'll do like all the information, I'll
6  just cut and paste the narrative from my arrest
7  report, and then they'll just copy and paste it
8  in.  So I don't know if they did that in this one.
9    Q   So when you were -- I want to ask you
10  one quick question.  On the first page of this
11  251, under Event No. 1, what does it say under
12  Event No. 1?
13   A   To the right of it?
14   Q   Yeah.
15   A   It says obstructing justice, threats to
16  do bodily harm.
17   Q   And what were the official charges
18  against Mr. Moore?
19   A   Threats to do bodily harm.
20   Q   What happened to the obstruction of
21  justice?
22   A   That gets generated like when -- it's

Page 101

1  like a drop-down menu.  So like all the charges
2  are like kind of listed like different and stuff.
3  So I guess for threats, if you go in there and you
4  hit threats to do bodily harm, that comes up with
5  it.  I've never actually heard that charge, never
6  seen it charged on anything, so --
7    Q   Why didn't you charge Mr. Moore with
8  obstruction of justice?
9    A   Like I said, I never really heard anyone
10  charge anyone with that, you know.  I think the
11  more relevant, if you're going to charge that, is
12  APO.  Like even though APO is assault on police
13  officer, if you interfere and impede in a police
14  investigation, you can lock them up for APO, which
15  we've done plenty of times on crime scenes where
16  crime tape is up, shooting victim, and people
17  continue to try to interfere.  I've seen people
18  get locked up for APO, but I've never heard of
19  obstructing justice.
20   Q   APO stands for?
21   A   Assault on a police officer.  But under
22  the statute, it's interfering or impeding a police

Pages 98 to 101

1    investigation, you can lock them up for it.
2        I mean, I've seen it done.  It gets
3    thrown out a lot in court because people can't
4    really put two and two together.  I don't really
5    think it belongs here, to be honest with you,
6    because I think assault is assault, you know, not
7    really -- that seems like a better charge.
8        Q    The obstruction of justice?
9        A    Yeah, I would say so, but --
10       Q    And you've never charged anyone with
11   obstruction of justice?
12       A    No.
13       Q    Go back to the event.
14           When you saw Mr. Moore, was he riding on
15   the sidewalk in front of the barbershop?
16       A    Yeah, he was like doing circles at that
17   point.
18       Q    Just on the sidewalk?
19       A    Yeah, and then he went in the street for
20   a little bit, kind of like riding, just yelling.
21       Q    How long did he do that?
22       A    Several minutes, and then that's when he

Page 102

1    returned.  He came down the sidewalk with a phone
2    in his hand to Lieutenant Alter, said his mother
3    wanted to talk to him.
4        Q    When you said down the street or down
5    the block --
6        A    So looking at the barbershop, where all
7    this incident took place on the wall over there,
8    the sidewalk.  So he's coming down the sidewalk
9    towards us.  So I think that's -- I don't know if
10   that's -- I think it might be north.  I'm not
11   sure.
12       Q    Do you recall any of the cross streets?
13   Are there like major intersections?
14       A    Yeah.  If you go up to the top of the
15   hill, it's going to be Alabama Avenue -- or
16   Naylor Road, I'm sorry.
17       Q    So if you're standing looking at the
18   face of the barbershop, Naylor Road is which way?
19       A    To the left.
20       Q    To the left?
21       A    To the left.
22       Q    And that's the direction he was

Page 103

1    traveling?
2        A    Yeah, and that's the same direction his
3    mother eventually came up from.
4        Q    From down toward Naylor Road?
5        A    Yeah.
6        Q    And was he riding on the sidewalk in
7    front of the house next door?
8        A    He was like doing circles all in that
9    immediate area.  So, yeah, at some point he was
10   doing that, and then he would stop his bike, kind
11   of put a foot down, make more comments, then kind
12   of ride off, come back.
13           I took it like he was being a clown.
14   I'm sorry, I don't mean to throw that out there,
15   but that's how I took it like.
16       Q    And then when in the span of all this
17   did he put the bike down and go next door?
18       A    He was over by the wall and he put the
19   bike down, he was like standing there, and that's
20   when he started like -- prior to this, he was kind
21   of making comments like just yelling out.  That's
22   when he starts like looking at us, like making

Page 104

1    comments directly towards us.
2        Q    Where's his mom at this point?
3        A    That's what I'm saying, I don't know
4    where she was, because she initially was there and
5    she was like, "You need to leave, get your ass up
6    the street," like yelling at him.
7        Q    What did he do when she told him that?
8        A    He did nothing.  He just stood there and
9    kind of yelled at his mother.  He was
10   disrespectful to his mother, I remember that.
11       Q    Do you remember what he said?
12       A    No.  I just remember him like, "Leave me
13   alone, mom," and all that, and then she was like
14   he has mental issues, he's got issues.  And we're
15   like, okay, get him out of here then.  He has
16   nothing to do with what we're doing.
17       Q    Who did she tell he had mental issues
18   to?
19       A    She was yelling that to him.  She
20   actually came over to us and she was just like,
21   "I'm trying to get him out of here," you know.
22   And then she said, "He has mental issues." I

Page 105

Pages 102 to 105

1  remember her saying that like three or four times.
2          And then even after this whole incident
3  happened, when she's in handcuffs, she was like,
4  "Can I go over and speak to him?"  I was like,
5  "Usually we don't."  I'm like, "Yeah, you can come
6  over if you want, take his property, take all his
7  property," and she was just like, "He's got
8  issues.  He's got mental issues."  I'm like,
9  "Well, you had your chance to get him out of here,
10  and then he threatened us."
11          I mean, I felt bad for the mother, I
12  did, because she came down trying to be a mom,
13  trying to get him out of there, and then this
14  thing escalated to this point where he ended up
15  being arrested.
16      Q   And when she was trying to get him to
17  leave, was she standing there?  Was she just
18  saying it to him?
19      A   She was saying that, and then she was
20  like coming up to us being like, "Leave him alone.
21  I'm trying to get him out of here."  Because we
22  were like, "Get him out of here.  Like, you know,

Page 106

1  just get him out of here."
2      Q   Did she do anything else to try to
3  encourage him to leave?
4      A   I mean, she yelled at him.  I didn't see
5  her.  She didn't physically grab him, drag him up
6  the street, but she was being a mom trying to get
7  him out of there.
8      Q   And what did he do in response?
9      A   He was just being disrespectful to her
10  and kind of brushing her off, just showing off for
11  like the group out there.
12      Q   Did he touch her in any way?
13      A   I didn't see that, no.
14      Q   And you don't recall whether or not you
15  arrested anyone since then for threats to do
16  bodily harm?
17      A   No, I really don't.
18      Q   But you have done more than that one
19  arrest?
20      A   Yeah, I know I have, yes.  I'm not sure
21  about --
22      Q   But you just can't remember prior or

Page 107

1  after?
2      A   Yeah.  I mean, I make hundreds and
3  hundreds of arrest a year, or I used to before I
4  became a detective, so I don't really recall.
5      Q   But not hundreds and hundreds of threats
6  to do bodily harm?
7      A   No.  Heck no, no.
8      Q   Because you would remember that?
9      A   Yeah, I'd remember that, yeah.  I think
10  when you asked me the whole statute about threats,
11  I'd have a great answer for you, but it's pretty
12  limited how many arrests I've had with that.
13      Q   That's all I have for you today.
14      A   Okay.
15          MR. DeBERARDINIS:  I just have a couple
16  of quick questions.
17      EXAMINATION BY COUNSEL FOR DEFENDANTS
18          MR. DeBERARDINIS:
19      Q   Did you prepare a UFIR in this case?
20      A   No, I didn't.
21      Q   Why not?
22      A   Because all we did was use a hand

Page 108

1  control, and you don't have to do hand controls
2  for use of force, and I didn't use a use of force.
3  Basically grabbed ahold of him, the mother grabbed
4  me, we all fell to the ground.  To me, that's not
5  a use of force.  My official reviewed it and
6  decided that wasn't a use of force, so there's
7  nothing to report.
8          MR. DeBERARDINIS:  Okay, I have no other
9  questions.
10          THE REPORTER:  Signature?  Read and
11  sign?
12          MR. DeBERARDINIS:  You have the right to
13  review the transcript before it becomes what I'll
14  call official, have changes made if you believe
15  it's appropriate, or you can waive that.
16          MR. WALLACH:  In case she took down a no
17  and you meant yes, or when you thought you said
18  yes, but you don't have to read it.
19          MR. DeBERARDINIS:  Yeah, he should
20  probably read it.
21          (The deposition adjourned at 11:09 a.m.)
22

Page 109

Pages 106 to 109

```
 1      CERTIFICATE OF NOTARY PUBLIC
 2        I, DAWN A. JAQUES, a Notary Public in and for
        the District of Columbia, before whom the foregoing
 3      deposition was taken, do hereby certify that witness
        whose testimony appears in the foregoing pages was
 4      duly sworn by me; that the testimony of said witness
 5      was taken by me in shorthand at the time and place
        mentioned in the caption hereof and thereafter
 6      reduced to typewriting under my supervision; that
        said deposition is a true record of the testimony
 7      given by said witness; that I am neither counsel
        for, related to, nor employed by any of the parties
 8      to the action in which this deposition is taken;
        and, further, that I am not a relative or employee
 9      of any attorney or counsel employed by the parties
        thereto, nor financially or otherwise interested in
10      the outcome of the actions.
11
12
13
14
15
16      _____
17         Dawn A. Jaques, CSR, CLR
18         Notary Public in and for
           District of Columbia
19
20      My commission expires:
21      January 14, 2015.
22
```
Page 110

```
 1  Digital Evidence Group, L.L.C.
    1726 M Street, NW, Suite 1010
 2  Washington, D.C. 20036
    (202) 232-0646
 3
 4  SIGNATURE PAGE
 5
 6
 7  Case: Angelique Moore v. District of Columbia
    Witness Name: Michael Charles Callahan
 8  Deposition Date: October 28, 2013
 9
10  I do hereby acknowledge that I have read
    and examined the foregoing pages
11  of the transcript of my deposition and that:
12
    (Check appropriate box):
13  ( ) The same is a true, correct and
    complete transcription of the answers given by
14  me to the questions therein recorded.
    ( ) Except for the changes noted in the
15  attached Errata Sheet, the same is a true,
16  correct and complete transcription of the
17  answers given by me to the questions therein
18  recorded.
19
20  _____  _____
21    DATE            WITNESS SIGNATURE
22
```
Page 112

```
 1  Michael Charles Callahan c/o
 2  Office of the Attorney General
 3  441 Fourth Street, N.W., Suite 6S-052
 4  Washington, DC 20001
 5
 6  Case: Angelique Moore v. District of Columbia
 7  Date of deposition: October 28, 2013
 8  Deponent: Michael Charles Callahan
 9
    Please be advised that the transcript in the above
10  referenced matter is now complete and ready for signature.
    The deponent may come to this office to sign the transcript,
11  a copy may be purchased for the witness to review and sign,
    or the deponent and/or counsel may waive the option of signing.
12  Please advise us of the option selected.
    Please forward the errata sheet and the original signed
13  signature page to counsel noticing the deposition, noting the applicable
14  time period allowed for such by the governing Rules of Procedure.
15  If you have any questions, please do not hesitate to call our office at
16  (202)-232-0646.
17
18  Sincerely,
19  Digital Evidence Group
20  Copyright 2013 Digital Evidence Group
21  Copying is forbidden, including electronically, absent express written
22  consent.
```
Page 111

```
 1  Digital Evidence Group, L.L.C.
    1726 M Street, NW, Suite 1010
 2  Washington, D.C. 20036
    (202) 232-0646
 3
 4
 5      E R R A T A   S H E E T
 6
 7  Case: Angelique Moore v. District of Columbia
 8  Witness Name: Michael Charles Callahan
    Deposition Date: October 28, 2013
 9    Page No.   Line No.       Change
10
11
12
13
14
15
16
17
18
19
20  _____       _____
21    Signature                Date
22
```
Page 113

Pages 110 to 113