## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

ANGELIQUE MOORE, *et al.*,

       Plaintiffs,

v.

DISTRICT OF COLUMBIA, *et al.*,

       Defendants.

</td><td>

Civil Action No. 12-0490 (BAH)

Judge Beryl A. Howell

</td></tr>
</table>

## MEMORANDUM OPINION

Pending before the Court is a motion for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, filed by the defendants, the District of Columbia and five officers of the Metropolitan Police Department ("MPD")[1] (collectively, "defendants"), on eight of the sixteen claims asserted by the plaintiffs, Angelique Moore and her son Eric Moore, arising from an incident with the police that occurred in April 2011.  For the reasons set out below, this motion is granted in part and denied in part.

## I.      BACKGROUND

### A.      Factual Background

The claims in this case stem from an altercation between the plaintiffs and the defendant MPD officers on April 1, 2011.  The parties agree that this incident began when nineteen year old Mr. Moore[2] was riding his bike along the sidewalk in front of a family friend's home, which was next door to a barbershop, where the five defendant police officers had just executed a search warrant.  Second Am. Compl. ("SAC") ¶¶ 7-9, ECF No. 16; Defs.' Mot. Supp. Partial

---

[1] The five defendant MPD officers are: Lieutenant John Alter, Officer Michael Callahan, Officer Jeremy Sharpton, Officer Hilary Dossen and Officer Tony Coles.

[2] Mr. Moore provided his date of birth at his deposition. Defs.' Mot. Supp. Partial Summ. J. ("Defs.' Mot."), Ex. 1, (Dep. of Eric Moore ("E. Moore Dep."), at 5:22), ECF No. 28-1.

Summ. J. ("Defs.' Mot."), Ex. 1 (Dep. Of Eric Moore ("E. Moore Dep.") at 10:8-20), ECF No.

28-1.  As Mr. Moore passed the barbershop, he claims that Lieutenant John Alter "stood in [his]

path," prompting Mr. Moore to "change[] course to ride safely around Lieutenant.  Alter and to

avoid making contact with the officer."  SAC ¶ 10.  According to the plaintiffs, words were then

exchanged between Mr. Moore and the Lieutenant Alter.  The latter allegedly told Mr. Moore "to

watch where he was going," prompting  Mr. Moore to respond that Lieutenant Alter saw him

riding on the sidewalk, moved into Mr. Moore's path, and could have moved out of the way.

SAC ¶ 11; E. Moore Dep. at 20:19-20.

 The plaintiffs claim that Lieutenant Alter then approached and assaulted Mr. Moore by

deliberately bumping Mr. Moore and knocking a baseball cap off of Mr. Moore's head.  SAC ¶

12; *see also* Defs.' Stm. Of Undisputed Material Facts ("Defs.' SMF") ¶ 1, ECF No. 28; Pls.'

Resp. to Defs.' SMF ("Pls.' Resp. SMF") ¶ 1, ECF No. 29.  Lieutenant Alter denies that this

physical contact occurred.  Pls.' Resp. SMF ¶ 1.  Mr. Moore protested that Lieutenant Alter had

no right to touch him, to which Lieutenant Alter allegedly stated "that he could do whatever he

wanted and then threatened to impound Mr. Moore's bicycle at the Seventh District police

station if Mr. Moore continued to speak."  SAC ¶ 13; *see also* Pls.' Resp. SMF ¶ 1.  After further

protest from Mr. Moore, Lieutenant Alter allegedly "abruptly snatched the bicycle from Mr.

Moore and threw it onto the lawn" of the Moores' friends' residence, next door to the

barbershop.  SAC ¶ 14; E. Moore Dep. at 22:7-9.

 This alleged encounter of a young man talking back to a police officer was the trigger for

an escalating series of unfortunate events.  Mr. Moore then called his mother, Ms. Moore, on his

cell phone to report his encounter with Lieutenant Alter.  Defs.' SMF ¶ 2; Pls.' Resp. SMF ¶ 2

("Undisputed").  At his mother's request, Mr. Moore tried to get Lieutenant Alter to speak by

telephone with Ms. Moore, but Lieutenant Alter refused to speak with Ms. Moore.  SAC  ¶ 16; *see also* Pls.' Resp. SMF ¶ 3; E. Moore Dep. 25:16-26:5; Pls.' Mem. Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n"), Ex. 2 (Dep. Of Michael Callahan ("Callahan Dep.") at 34:7-12), ECF No. 29-2.  Lieutenant Alter disputes this allegation and claims that he spoke to Ms. Moore by telephone. Pls.' Resp. SMF ¶ 3.  Ms. Moore told her son to wait at the scene and that she would join him. Defs.' SMF ¶ 3; Pls.' Resp. SMF ¶ 3.

After traveling about six blocks to the scene, Ms. Moore tried to speak to Lieutenant Alter about his treatment of Mr. Moore.  SAC  ¶ 18; E. Moore Dep. 29:21-22;  Defs.' Mot., Ex. 2 (Dep. of Angelique Moore ("A. Moore Dep.") at 17:17-19), ECF No. 28-2;  Pls.' Opp'n., Ex. 1 (Dep. of John Alter ("Alter Dep.") at 49:1-11), ECF No. 29-1.  While Ms. Moore was talking with Lieutenant Alter, Officer Callahan exited the barber shop, approached Mr. Moore and said that "he would like to fuck him" and that "I like you and the other guys in jail would like you as well."  Defs.' SMF ¶ 4; Pls.' SMF ¶ 4; Callahan Dep. at 33:12-20; E. Moore Dep. 39:7-10. Officer Callahan denies that he made these statements.  Pls.' Resp. SMF ¶ 4; Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 8, n.2, ECF No. 28.  Mr. Moore responded by yelling and cursing at Officer Callahan to get away and to leave him alone.  SAC ¶¶ 21, 27; A. Moore Dep. 23:11-24:2. Ms. Moore could see that her son became very upset, although she could not hear what Officer Callahan had said to her son.  Defs.' SMF ¶ 5; Pls.' Resp. SMF ¶ 5 ("Undisputed").

Ms. Moore then "tried to calm [ ] down" her son.  Defs.' SMF ¶ 6; Pls.' Resp. SMF ¶ 6. They walked over to a "concrete landing" in their friends' front yard to have a private conversation.  SAC ¶ 29.  While Ms. Moore's back was turned to the officers, Mr. Moore saw one of the officers give a hand signal to Officer Callahan, and then, without any other warning, Officer Callahan tackled both plaintiffs to the concrete landing.  SAC ¶¶ 29-32*; see also* Defs.'

SMF ¶ 6; Pls.' Resp. SMF ¶ 6; E. Moore Dep. 46:12-48-3; A. Moore Dep. 26:12-20.  Officer

Callahan denies tackling the plaintiffs to the ground.  Defs.' Mem. at 8, n.2.  Ms. Moore was

struck from behind and Officer Callahan landed on top of her body.  SAC ¶ 33; A. Moore Dep.

27:4-13.

      While Ms. Moore remained on the ground, Officers Callahan and Sharpton placed

handcuffs on Mr. Moore and arrested him.  Defs.' SMF ¶¶  7-8; Pls.' Resp. SMF ¶¶ 7-8

("Undisputed"); E. Moore Dep. 48:5-10; A. Moore Dep. 27:19-22–29:1-3.  According to Mr.

Moore, he was "originally told that he was being arrested for disorderly conduct," but was

subsequently charged with making threats to do bodily harm to Officers Callahan and Sharpton.

Pls.' Resp. SMF ¶ 8; SAC ¶ 39.  Officer Callahan states that he arrested Mr. Moore for threats to

do bodily harm after Mr. Moore made the threat that "I will kill both of your asses."  Defs.'

Mem. at 8, n.2 (citing Witness Statement Callahan at 2, Ex. 12, ECF No. 28-12).[3]  Mr. Moore

was "incarcerated overnight" and then released the next day "subject to a deferred prosecution

agreement."  SAC  ¶ 39.  The charge was eventually dropped but the plaintiffs allege that Mr.

Moore nonetheless "remain[ed] saddled with a wrongful arrest record and suffers from all the

indignities and disadvantages attendant therewith."  *Id.* ¶ 40.

      When Ms. Moore finally stood up, she had pain in her right hand, arm and shoulder. A.

Moore Dep. 29:20-22, 33:14-17; Defs.' Mot. Ex. 10 (A. Moore's Objs. and Resps. to Defs.' First

Set of Interrogs. ("A. Moore Resp. to Defs.' Interrog."), Resp. to Interrog. No. 7), ECF No. 28-

10.  She sought medical treatment for the injuries to her right hand and shoulder at Suburban

---

[3] The defendants indicate that "[f]or purposes of the instant motion the Court need not resolve this factual dispute," Defs.' Mem. at 8, n.2, apparently referring to the denials by Officer Callahan that he tackled the plaintiffs or made any sexual or improper remarks to Mr. Moore, and Mr. Moore's denial that he ever made an oral threat to the officers.

Hospital, where she was employed, and sought subsequent treatment for her back.  SAC ¶ 37; A. Moore Dep. 33:10-17, 34:4-13; A. Moore Resp. to Defs.' Interrog. No. 8.

On May 13, 2011, Ms. Moore filed a complaint with the Office of Police Complaints ("OPC") regarding the MPD Officers' conduct and this complaint was dismissed on January 4, 2012.  SAC ¶¶ 42, 47.

### B.    Procedural History

About one year after their altercation with the MPD Officers, the plaintiffs initiated this lawsuit.  Compl., ECF No. 1.  The defendants' first motion for partial dismissal of the complaint, Defs.' Mot. Partial Dismissal Compl., ECF No. 3, was denied as moot, with the defendants' consent, when the plaintiffs filed a First Amended Complaint ("FAC"), ECF No. 8, setting out eighteen claims against the defendants.  *See* Minute Order (May 29, 2012).  The Court subsequently, in an oral ruling after a motions hearing, denied in part and granted in part the defendants' motion to dismiss the FAC, under Federal Rule of Civil Procedure 12(b)(6).  Minute Order (March 8, 2013).  The plaintiffs then filed a Second Amended Complaint ("SAC"), which is the operative complaint in this case.  SAC, ECF No. 16.

The SAC alleges, in sixteen counts, violations of the plaintiffs' Fourth and Fifth Amendment rights, as well as numerous common law claims, including assault, battery, false arrest, false imprisonment, negligent infliction of emotional distress, negligence in hiring, training, supervision and retention, and negligent infliction of emotional distress, stemming from the April, 2011 incident involving the five defendant MPD defendants.  *See generally*, SAC. After a discovery period of eight months,[4] the defendants filed the pending motion seeking partial summary judgment on: (1) "all claims" by the plaintiffs against MPD Officer Coles, who

---

[4] The Court initially directed that all discovery close on September 30, 3013, *see* Scheduling Order (Apr. 1, 2013), but, at the parties' request, extended the discovery period three times until November 30, 2013.  *See* Minute Orders (July 23, 2013, Sept. 24, 2013, and Oct. 31, 2013).

is named in Counts 1 and 3, Defs.' Mot. ¶ 1; *see also* SAC, captions for First and Third Claims

For Relief "Against All Defendant Officers;" (2) the Fourth Amendment claim by Mr. Moore

against the District for failure to train, supervise, fire or suspend the defendant MPD Officers

regarding "the need for probable cause when searching or arresting citizens," in Count 2, Defs.'

Mot. ¶ 2; (3) the Fifth Amendment claims by Ms. Moore for deprivation of liberty without due

process against four of the defendant MPD Officers, namely: "Officers Jeremy Sharpton, Hilary

Dossen, Tony Coles and John Alter," *id.* ¶ 3,[5] and for failure to train, supervise, fire or suspend

the defendant MPD Officers against the District, *id.* ¶ 4, in Counts 3 and 4, respectively; (4) the

false imprisonment claim by Mr. Moore against the District and Officers Callahan, Sharpton and

Dossen, in Count 10, *id.* ¶ 5; (5) the claims by each plaintiff for negligent hiring, training

supervision and retention against the District and Lieutenant Alter, in Counts 12 and 16,

respectively, *id.* ¶¶ 6, 8; and (6) the negligence claim by Ms. Moore against the District and

Officer Callahan, in Count 14,  *id.* ¶ 8.  *See also* Defs.' Mem. at 6-7.

The defendants recognize that even if their motion is granted, this "will not resolve all

issues in the case as to Defendant District of Columbia."  Jt. Status Rpt. & Explanation

Concerning the Parties' Inadvertent Delay in Filing ("Jt. Status Rpt."), at ¶ 2, ECF No. 24.[6]  Nor

---

[5] The defendants' motion does not seek summary judgment on Ms. Moore's Fifth Amendment claim in Count 3 against Officer Callahan, whose name is omitted from the list of MPD Officers for whom the defendants are seeking summary judgment on this claim.  *See* Defs.' Mot. ¶ 3.  Similarly, the defendants' memorandum in support of their motion omits Officer Callahan from the summary of the relief sought on Count 3.  *See* Defs.' Mem. at 6.  Despite the omission twice of Officer Callahan's name from the list of MPD Officers for whom the defendants are seeking partial summary judgment on Count 3, the defendants argue that "all of the Fifth Amendment claims should be dismissed," *id.* at 9; *see also id.* at 15 ("All Defendants Are Entitled to Summary Judgment As to the Fifth Amendment Claims of Angelique Moore (Third and Fourth Claims)").  This inconsistency in the defendants' motion and briefing papers is, at a minimum, confusing.

[6] The defendants do not challenge the following eight of the plaintiffs' claims: Count 1 (alleged violation of Mr. Moore's Fourth Amendment rights against all defendants, except for challenging the claim against Officer Coles); Counts 5 and 6 (assault and battery claims, respectively, of Mr. Moore against the District and Lieutenant Alter); Counts 7 and 8 (assault and battery claims, respectively, of Mr. Moore against the District and Officer Callahan); Counts 11 and 15 (negligent infliction of emotional distress claims by Mr. Moore and Ms. Moore, respectively, against the District and Officer Callahan); and Count 13 (battery claim of Ms. Moore against the District and Officer Callahan).

would prevailing on this motion resolve all claims against the defendant MPD Officers, except for Officer Coles, who appears to be the only defendant officer for whom the pending motion seeks full, rather than just partial, summary judgment.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute.  *Id*. at 323.

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc*. ("*Anderson*"), 477 U.S. 242, 255 (1986).  As the Supreme Court recently stressed, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson*, 477 U.S. at 249).  When a court "fail[s] to credit evidence" presented by the nonmovant "that contradict[s] some of its key factual conclusions, the court improperly weigh[s] the evidence and resolve[s] disputed issues in favor of the moving party."  *Id*. at 1866 (internal quotations and citations omitted).

In evaluating the evidence offered at summary judgment, the Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other

materials in the record." FED. R. CIV. P. 56(c)(3).  Discerning whether a genuine factual dispute requires presentation to a jury "is as much art as science."  *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  To be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Anderson*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in that party's favor on all essential elements of the claim on which that party will bear the burden of proof at trial.  *See* FED. R. CIV. P. 56(c)(1); *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (noting that at the summary judgment stage, plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true,'" quoting *Sierra Club v. EPA*, 292 F.3d 895, 898–99  (D.C. Cir. 2002) (ellipsis in original)); *see also Solomon v. Vilsack*, 763 F.3d 1, 12 (D.C. Cir. 2014); *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.    DISCUSSION

Despite internal inconsistencies in the defendants' moving papers, *see supra*, n.5, the defendants appear to seek partial summary judgment and dismissal against all or some of the defendants on the eight claims contained in Counts 1, 2, 3, 4, 10, 12, 14 and 16 of the SAC.  The

plaintiffs counter that genuine issues of material fact exist precluding the entry of summary judgment on these challenged claims, which are addressed *seriatim* below. [7]

### A.  Counts 1 and 3 Against MPD Officers

The plaintiffs allege that all of the defendant MPD officers are liable, under 42 U.S.C. § 1983, in Count 1, for violating Mr. Moore's Fourth Amendment right "to be secure from state actions which result in unlawful searches, seizures, and arrests without probable cause," SAC ¶ 62; and, in Count 3, for violating Ms. Moore's Fifth Amendment right "to be secure from state actions which result in the deprivation of liberty without due process, including the right to be free of unlawful touching and physical restraint," SAC ¶ 75.  Section 1983 makes unlawful any person acting under color of law to deprive any other person of any federal constitutional or statutory rights.[8]

---

[7] The defendants moved for summary judgment on Mr. Moore's claim for false imprisonment in Count 10, arguing that this claim "is duplicative of" and "indistinguishable as a practical matter from" the false arrest claim, in Count 9, since the critical question for both claims is "'whether the arresting officer was justified in ordering the arrest of the plaintiff . . ..'" Defs.' Mem. at 20-21 (quoting (*Sharon*) *Scott v. District of Columbia,* 493 A.2d 319, 321 (D.C. 1985)).  Indeed, the common-law cause of action for false arrest is essentially identical to a cause of action for false arrest under the Fourth Amendment. *Harris v. U.S. Dep't of Veterans Affairs*, No. 13-5207, 2015 U.S. App. LEXIS 995 at *7 n.2 (D.C. Cir. Jan. 23, 2015)("In the District of Columbia, the torts of false arrest and false imprisonment are indistinguishable.") (internal quotations and citation omitted); *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 214 (D.D.C. 2010) ("There is no real difference as a practical matter between false arrest and false imprisonment.") (internal quotation marks and citations omitted); *Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 95 (D.D.C. 2008) ("Common-law and constitutional claims of false arrest are generally analyzed as though they comprise a single cause of action.").  The plaintiffs failed to respond to this part of the defendants' motion.  *See generally*, Pls.' Opp'n.  "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997);*Wannall v. Honeywell, Inc*., No. 13-7185, 2014 U.S. App. LEXIS 24547, at *5 (D.C. Cir. Dec. 30, 2014) (noting that Local Civil Rule 7(b) "is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded"); *Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (holding that plaintiff conceded the merits of an issue when he "did not respond in any way to defendant's argument" on that issue in his opposition before the district court) (citing LOCAL CIV. R. 7(b)); *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").  Therefore, the defendants' motion for summary judgment as to Count 10 for false imprisonment is granted as conceded.

[8] Section 1983 provides, in pertinent part, that every person "who, under color of [state or D.C. law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.

Officer Coles is named as a defendant in only Counts 1 and 3 of the Second Amended Complaint.  The defendants argue that Officer Coles is "entitled to summary judgment as to Plaintiffs' Fourth and Fifth Amendment claims against him," because this officer  was not "in any way involved in the allegations" underlying these claims.  Defs.' Mem. at 10.[9]  Moreover, the defendants contend that Ms. Moore's Fifth Amendment claim in Count 3 fails as to all or, alternatively, at least four, of the defendant MPD Officers because, even if her allegation about being tackled by Officer Callahan were true, (1) this conduct fails "[t]o constitute a Fifth Amendment substantive due process claim," as to any MPD Officer, Defs.' Mem. at 15-16;  and, alternatively, (2) should "the alleged conduct on the part of Officer Callahan in tackling [Ms.] Moore to the ground [] be deemed a Fifth Amendment violation, such conduct cannot be imputed to Lt. Alter or Officers Sharpton, Dossen or Coles," who did not participate in any way, *id.* at 17.

The Court first addresses the defendants' argument that Count 3 does not sufficiently allege a violation of a Fifth Amendment substantive due process right against any defendant before turning to the defendants' remaining challenges to Counts 1 and 3, which are predicated on the lack of bystander liability for MPD Officers Sharpton, Dossen and Coles and Lieutenant Alter.

### 1.    Defendants Are Not Entitled to Summary Judgment On Count 3

The defendants contend in their memorandum in support of partial summary judgment that "all Defendants," including Officer Callahan, are entitled to summary judgment on Ms. Moore's Count 3. [10]  *See generally* Defs.' Mem. at 15.  In this claim, Ms. Moore alleges that,

---

[9] The defendants do not seek summary judgment for any of the remaining defendant MPD officers on Count 1.  *See generally*, Defs.' Mot. and Defs.' Mem.

[10] As noted, *supra* n.5, this specific challenge to Count 3 was not set out in the defendants' summary of the relief sought in the motion, which instead only sought summary judgment on this claim as to four of the five defendant MPD Officers, rather than all of them.  *See* Defs.' Mot. ¶ 3 (seeking summary judgment on "The Fifth Amendment claims of Plaintiff Angelique Moore against Metropolitan Police Department Officers Jeremy Sharpton, Hilary Dossen, Tony Coles and Lt. John Alter (Third Claim for Relief)."); Defs.' Mem. at 6 (same).  The defendants

without any provocation, she was tackled by Officer Callahan from behind as she was comforting her son and, as a result, sustained minor injuries from being pushed down to the concrete. The defendants' concede that such conduct may give rise to assault and battery claims against both plaintiffs, as asserted in Counts 5, 7, 8, and 13, which are not challenged in the pending motion, but argue this alleged conduct "does not rise to the level of conscience shocking conduct that is required to sustain a substantive due process claim" and no reasonable juror could conclude otherwise. Defs.' Mem. at 16. Consequently, the defendants seek summary judgment on Ms. Moore' Fifth Amendment claim.[11] This proffered ground for summary judgment presents a close question but, for the reasons set out below, is denied.

At the outset, the parties agree that the standard applicable here for assessing whether a substantive due process right was violated is whether the conduct is "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see* Defs.' Mem. at 15; Pls.' Opp'n at 15.[12] In evaluating Ms.

---

previously sought dismissal of this claim against the District "and the individual police officers" on different grounds: namely, that Ms. Moore's allegation of excessive force should be brought under the Fourth, rather than Fifth, Amendment. *See* Defs.' Partial Mot. to Dismiss ¶ 1, ECF No. 10. This motion was denied by the Court since, as explained orally during the motions hearing, the government conduct at issue in Count 3 was not part of an investigatory stop or arrest amounting to a "seizure" and, consequently, the Fourth Amendment was not applicable, leaving the viability of her challenge subject to substantive due process under the Fifth Amendment. *See* Minute Order (Mar. 8, 2013) (denying defendants' motion to dismiss "the Fifth Claim of the Amended Complaint (alleging violation of Plaintiff Angelique Moore's Fifth Amendment rights) against the Individual Officers").

[11] While due process claims are typically analyzed under the U.S. Constitution's Fourteenth Amendment, the District of Columbia, which is not a State, is subject to the Due Process Clause of the Fifth Amendment. *See Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009); *Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (D.C. Cir. 2001).

[12] If another provision of the Constitution "provides an explicit textual source of constitutional protection," a court must assess a plaintiff's claims under that explicit provision and "not the more generalized notion of 'substantive due process.'" *Lewis*, 523 U.S. at 842 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Thus, generally, claims that law enforcement officers have used excessive force during "an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395; *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) ("A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."); *Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) (finding that "remedy for any harm . . . from the search of [plaintiff's] home is governed by the Fourth Amendment"). By contrast, where, as here, the challenged government conduct falls outside the scope of the Fourth Amendment or other "explicit textual source of constitutional protection," substantive due process may serve to

Moore's allegations under the Fifth Amendment, the Court is mindful that "the touchstone of due process is protection of the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective . . .." *Lewis*, 523 U.S. at 845-46 (internal quotations and citations omitted). "The conscience-shock inquiry is a 'threshold question' in a due process challenge to executive action" and serves "to differentiate substantive due process . . . from local tort law." *FOP Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (internal quotations and citations omitted).

"Conscience-shocking conduct that violates due process usually takes the form of affirmative state action." *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006). In discussing the requisite state of mind to meet the conscience-shocking standard, the Supreme Court has made clear that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849. At the same time, the Court has recognized that, in certain contexts, "[w]hether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but 'less than intentional conduct, such as recklessness or gross negligence,' is a matter for closer calls." *Id.* (citations omitted). No

---

vindicate abuses from government excessive force. *See Lewis*, 523 U.S. at 843-54 (in circumstances where a motorcycle passenger was killed when a police officer engaged in a high-speed chase with the driver of the motorcycle, the officer's conduct did not constitute a Fourth Amendment search or seizure, thereby allowing analysis under the substantive due process guarantee of the Fourteenth Amendment); *United States* v. *Lanier*, 520 U.S. 259, 272, n.7 (1997) (clarifying that *Graham* "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process"); *Robinson v. District of Columbia*, 736 F. Supp. 2d 254, 261 (2010) (finding that plaintiff, who was allegedly struck and killed by a D.C. police officer's car, properly alleged a Fifth Amendment claim because "conduct intended to injure in some way unjustifiable by any government interest' is unlikely to be covered by the Fourth Amendment and, instead, is the sort of official action most likely to rise to the conscience-shocking level' at issue in substantive due process cases.") (internal quotations and citations omitted).

mechanical rules are available in making this assessment since "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Id*. at 850. In other words, context matters when evaluating whether the force used meets the conscience-shocking test. *See Lewis*, 523 U.S. at 850 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another"). Consequently, "substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking," *id.*, including consideration of such circumstances as whether the government actor enjoyed the luxury "of having time to make unhurried judgments … the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," *id*. at 853; owed any special duty of care, such as that of prison officials for "the medical needs of their prisoners," *id*. at 850; or had the "purpose to cause harm," *id*. at 854. In sum, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*. at 849. Absent such intentional purpose to cause harm, the "middle range" of deliberate indifference culpability generally does not suffice for a substantive due process violation. *See id.* at 853-54 (considering that police officers deciding whether to give chase must exercise "instant judgment" and "balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range," led to conclusion that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under §1983"); *Smith v. District of Colum*bia, 413 F.3d 86, 93 (D.C. Cir. 2005) ("deliberate indifference will not violate due process where the state has no 'heightened responsibility toward the individual.'" quoting *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001)).

Turning to the challenged government conduct at issue in this case, the allegedly unprovoked, intentional tackling of Ms. Moore to the ground is a "form of affirmative state action," though plainly less egregious than other such conduct found to "shock the conscience." For example, the D.C. Circuit in *Estate of Phillips*, 455 F.3d at 403, described conduct meeting the conscience-shocking standard as including tackling a defendant and pumping his stomach against his will, *see Rochin v. California*, 342 U.S. 165, 172-73 (1952), or brutal and habitual beatings of prisoners, *see Norris v. District of Columbia.*,737 F.2d 1148, 1151 (D.C. Cir. 1984). Similarly, in *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 35 (D.D.C. 2007), the court concluded that "plaintiff's version of events" about being "repeatedly pushed and hit in the back, dragged across the nightclub floor, and then thrown to the ground outside" by off-duty officers supported a constitutional violation and warranted denial of officers' summary judgment motion. In comparison, being tackled to the ground involves less force and intrusion on a person's body than those examples of allegedly abusive government conduct. At the same time, the alleged unprovoked tackling from behind of Ms. Moore to the ground amounts to more than an allegation of a mere "push or shove," *Graham v. Connor*, 490 U.S. 389, 396 (1989), and also reflects the use of *more* force than that found insufficient to support a Fifth Amendment claim when, for example, a police officer merely grabbed the plaintiff's arm, *Garay v. Liriano*, 943 F. Supp. 2d 1, 21-22 (D.D.C. 2013), or made a "gratuitously violent shove," *Saucier v. Katz*, 533 U.S. 194, 208 (2001). Likewise, Ms. Moore's allegation that her tackling was unprovoked differentiates her circumstances from those cases where excessive force claims have been rejected. *See, e.g.*, *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (finding use of force "was not excessive" when police pulled plaintiff's arm behind her back and pushed her up against a stone column after she twice refused to comply with a police order); *Wasserman v.*

*Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (finding no excessive force used where officer forcefully pressed plaintiff's arm upwards before applying handcuffs after plaintiff refused to obey officer's order).

Consistent with the considerations noted in *Lewis*, the D.C. Circuit has outlined four "sensible guidelines" to evaluate whether government action rises to the conscience-shocking level: (1) "the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Norris*, 737 F.2d at 1150 (quoting *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973)); *see also FOP v. Gates*, 602 F. Supp. 2d 104, 109 (D.D.C. 2009); *Feirson v. District of Columbia*, 315 F. Supp. 2d 52, 61 (D.D.C. 2004).[13]  In this case, the first two factors weigh in favor of the plaintiffs.  Ms. Moore had not engaged in any conduct that even arguably would have warranted the use of force since she was allegedly in the process of comforting her son to calm the situation before she claims to have been tackled to the ground. Indeed, the defendants do not assert that there was any need for any use of force against her. Defs.' SMF ¶ 6; Pls.' SMF ¶ 6.  Her close proximity to her son, who was apparently the target of the arrest, also does not justify the intentional use of force against Ms. Moore.  The absence of any need or justification for the alleged intentional use of force against Ms. Moore is an important consideration in assessing the egregiousness of the challenged conduct.  *See Hunter v. District of Columbia*, 943 F.2d 69, 78 (D.C. Cir. 1991) ( "[w]here gratuitous brutalization is involved, less force oriented towards that end is needed to shock the judicial conscience [and] [w]here some force is justified, the Constitution may be offended if the force used grossly

---

[13] Application of this four-part substantive due process test was rejected in *Graham*, 490 U.S. at 395, when, unlike here, the excessive force claim involved conduct subject to the protections of the Fourth and Eighth Amendments.

exceeds that warranted by the circumstances.") (internal quotations and citations omitted).

With respect the third factor, the defendants' contention that Ms. Moore's injuries were only minor is of limited significance. Defs.' Mem. at 16 (noting she "reported only minor injuries from this interaction"). While the extent of injury is probative of the amount of force used, a permanent injury is not required to rise to the level of a constitutional violation. *Norris*, 737 F.2d at 1150-51. As the Supreme Court noted, "[i]njury and force [] are only imperfectly correlated, and it is the latter that ultimately counts" in assessing excessive force claims. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). Notably, in *Wilkins*, the Supreme Court reversed the appellate court's dismissal of an Eighth Amendment excessive force claim for "giving decisive weight to the purportedly *de minimis* nature of [plaintiff's] injuries" when the "core judicial inquiry" should be shifted "from the extent of the injury to the nature of the force—specifically, whether it was nontrivial and was applied maliciously and sadistically to cause harm." *Id.* (internal quotations, citations, and ellipses omitted).[14]

Finally, as to the last factor, as the plaintiffs' observe, the critical motives behind the application of force are unclear, including whether such force was intentional or accidental or occurred at all, since Officer Callahan denies using any force against Ms. Moore. Pls.' Opp'n at 16 (citing Callahan Dep. at 108:22–109:7). Indeed, the plaintiffs concede that whether Officer Callahan tackled the plaintiffs is a matter of genuine dispute since the defendant officers have testified "that Eric Moore knocked his own mother down" and "that everyone simply fell after a struggle." Pls.' Add'l Stm. Of Undisputed ("Pls.' Add'l SMF") ¶ 2, ECF No. 29.

---

[14] That is not to say that the nature of the alleged injuries sustained by Ms. Moore is irrelevant. On the contrary, "the relatively modest nature of [her] alleged injuries will no doubt limit the damages [she] may recover." *Wilkins*, 559 U.S. at 40.

This then raises a genuine factual dispute regarding both what occurred and why.  In this circumstance, the Court is bound to accept as true and draw all justifiable inferences in favor of the plaintiffs, who have consistently described the challenged conduct as an unprovoked and unwarranted physical and harmful assault on Ms. Moore.  *See Tolan*, 134 S. Ct. at 1863 (reversing summary judgment for police officers in excessive force case for failure of lower courts "to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") (internal quotations and citations omitted);  *Harris v. U.S. Dep't of Veterans Affairs*, No. 13-5207, 2015 U.S. App. LEXIS 995, at *11 (D.C. Cir. Jan. 23, 2015) (reversing summary judgment for police officers on plaintiff's assault and battery claim since parties offered materially different sworn statements regarding "what happened immediately before [plaintiff] was taken to the ground and handcuffed," the nature of the officers' physical contact with the plaintiff, and the injuries to the plaintiff resulting from such contact).  While minor pushes or shoves may not meet the conscience-shocking test, *Norris*, 757 F.2d at 1152, an unprovoked physical attack by a police officer on a public street involving an amount of force that results in the alleged target of the attack being thrown to the ground, with concomitant "substantial immediate pain as well as lingering ill effects," *id.*, is sufficient for a reasonable jury to conclude that a Fifth Amendment violation occurred.

Accordingly, the defendants' motion to dismiss Count 3 against all of the MPD officers for failure to allege sufficiently a violation of substantive due process is denied.

### 2.    Material Factual Issues Relating to Bystander Liability Preclude Summary Judgment For Defendant MPD Officers On Counts 1 and 3

The defendants contend that "the record in this case does not support as a matter of law a claim of 'bystander liability' against" Officer Coles on Mr. Moore's claim of unlawful arrest in

violation of the Fourth Amendment, in Count 1, and against Officers Sharpton, Dossen or Coles

and Lieutenant Alter on Ms. Moore's excessive force claim in violation of the Fifth Amendment,

in Count 3.  Defs.' Mem. at 10, 17. [15]  The plaintiffs counter that, since these officers were

undisputedly present at the scene and "observed the events that Ms. Moore has alleged to be

assaults," they had a duty to intervene to halt any conduct amounting to a constitutional

violation.  Pls.' Opp'n at 17.  To determine whether material issues remain for a jury to consider

on Count 1 against Officer Coles and Count 3 against four of the five defendant MPD Officers,

(excluding Officer Callahan), the Court briefly reviews the legal principles governing bystander

liability for police officers before turning to application of these principles in this case.

### (a) Bystander Liability For Police Officers

The defendants do not dispute that "an officer possesses an affirmative duty to intervene

to protect the constitutional rights of citizens from infringement by other law enforcement

officers."  Defs.' Mem. at 17 (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th

Cir. 2002)).  Even if the defendant officer was not the person directly committing a constitutional

violation, that officer may nonetheless be held responsible when the officer: (1) knows that a

fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to

prevent the harm; and (3) chooses not to act.  *See Fernandors v. District of Columbia*, 382 F.

Supp. 2d 63, 72 (D.D.C. 2005); *Masel v. Barrett*, 707 F. Supp. 4, 8 (D.D.C. 1989); *see also

Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012) ( "a defendant police officer may

be held to account both for his own use of excessive force on the plaintiff, as well as his failure

to take reasonable steps to attempt to stop the use of excessive force by his fellow officers.")

(internal citations omitted); *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) ("[i]f [the

---

[15] Even though all of the defendant MPD officers are named in Count 1, the defendants do not seek summary judgment for any officer other than Officer Coles on this claim.  *See generally*, Defs.' Mot. and Defs.' Mem.

plaintiff] can show at trial that an officer attacked him while another officer ignored a realistic

opportunity to intervene, he can recover.").  Indeed, the D.C. Circuit has made clear that

"deliberate indifference" on the part of a government official, who knew or should have known

of the risks of constitutional violation, but failed to act, may support liability under Section 1983.

*Jones v. Horne*, 634 F.3d 588, 601-02 (D.C. Cir. 2011).

The D.C. Circuit's recent decision in *Wesby v. District of Columbia*, 765 F.3d 13 (D.C.

Cir. 2014), is instructive.  There, the Court rejected the contention asserted by defendant MPD

officers that they could not be held liable under Section 1983 for violation of the plaintiffs'

Fourth Amendment rights stemming from the plaintiffs' arrest without probable cause "because

they did not personally arrest each of the [p]laintiffs."  *Id*. at 29. While the plaintiffs were

required to "produce evidence that each [officer] through [his] own individual actions, has

violated the Constitution," the officers' participation as "the hub" in the investigation by

gathering evidence and questioning witnesses amounted to more than mere presence and was

"sufficient to establish causation" for the Section 1983 claim.  *Id*.  Notably, the Court cited as

support for its holding the Fifth Circuit's decision in *James v. Sadler*, 909 F.2d 834, 837 (5th Cir.

1990), that "officers who did not physically perform pat-down but who 'remained armed on the

premises throughout the entire search' could be held liable under Section 1983 as 'participants

rather than bystanders.'"  *Id*. at 30.  Thus, under the law of this Circuit, contrary to the

defendants' argument, police officers are not entitled to summary judgment in Section 1983

excessive force suits merely because they had no physical contact with the plaintiff.

### (b) Genuine Material Issues Remain On Counts 1 and 3

Set against these general principles of bystander liability for police officers, the Court

now turns to the parties' arguments regarding Officers Coles, Sharpton and Dossen and

Lieutenant Alter, beginning with the defendants' assertion that Officer Cole, at a minimum, is entitled to judgment in his favor.

The parties do not dispute that Officer Coles had no physical contact with the plaintiffs, and the plaintiffs do not even allege that he did.  *See generally*, SAC; Pls.' Opp'n at 18-19; Defs.' SMF ¶ 9.  As the plaintiffs correctly point out, however, "that is not the end of the equation."  Pls.' Opp'n at 18-19.  Instead, the plaintiffs allege in support of their Fourth and Fifth Amendment claims that, as an officer "at the scene," Officer Coles "knew or had reason to know that a constitutional violation was being committed by [his] fellow officers, had a reasonable opportunity to prevent" the violations and "nonetheless failed to protect" both the plaintiffs and their constitutional rights.  SAC ¶¶ 66, 78.  Indeed, the defendants concede that Officer Coles "was on the scene of the incident in order to 'provide a uniformed police presence' in support of the officers dressed in plain clothes who were in the process of executing a search warrant."  Defs.' SMF ¶ 9; Defs.' Mem. at 10.  Officer Coles was close enough to the altercation to observe the conduct of his fellow officers and the plaintiffs.  Pls.' Resp. SMF ¶ 9.  He further confirms that he did not hear Mr. Moore make any threats against those officers, *id.*; Pls.' Add'l SMF, ¶ 1, ECF No. 29, but nonetheless he did not intervene, while aware of his duty to intervene, when his fellow officers engaged in conduct that resulted in tackling the plaintiffs to the ground and the arrest of Mr. Moore.  Pls.' Opp'n at 18.  These factual allegations, taken as true, are the predicate for the plaintiffs' claims of unlawful arrest and use of excessive force in violation of their constitutional rights, and are sufficient evidence for a jury to conclude that Officer Coles had a duty to intervene but failed to do so.  *See* Pls.' Opp'n at 19.

Similarly, the defendants contend that no bystander liability attaches to Officers Sharpton and Dossen and Lieutenant Alter since "[t]here is no evidence in this case that these defendants

participated in any way in the alleged 'tackling' of Plaintiff Angelique Moore" and, consequently, these officers are entitled to summary judgment on Ms. Moore's claim of excessive force in violation of the Fifth Amendment set out in Count 3.  Defs.' Mem. at 17. Although these officers were also indisputably at the scene, the defendants contend that "there is no indication that Lt. Alter and Officers Sharpton, Dossen and Coles had any advanced notice as to the alleged conduct on the part of Officer Callahan" such that "a juror could conclude that the officers had an opportunity to prevent the alleged conduct."  *Id.*  To the contrary, genuine issues of material fact exist as to whether signals were exchanged before Officer Callahan commenced his approach to and tackle of the plaintiffs; whether other officers at the scene were able to witness any signal, which would have given advance notice of the planned physical aggression; and whether the other officers were in sufficiently close proximity to have intervened to halt the physical approach to the plaintiffs.  As the Supreme Court explained in *Tolan*, "witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases [and] it is in part for that reason [] genuine disputes are generally resolved by juries in our adversarial system."  134 S. Ct. at 1868.

The factual disputes present in this case preclude the grant of summary judgment as requested by the defendants on Counts 1 and 3 against the MPD officers.

## B.       Challenges to Section 1983 Violations Against the District in Counts 2 and 4

The defendants argue that the District cannot be held liable under 42 U.S.C § 1983 for violations of Mr. Moore's Fourth Amendment rights, as claimed in Count 2, or for violations of Ms. Moore's Fifth Amendment rights, as claimed in Count 4, because the plaintiffs have failed to "demonstrate deliberate indifference on the part of the municipality."  Defs.' Mem. at 13; *id*. at 18 (advancing the same arguments against Ms. Moore's Fifth Amendment claim in Count 4 as against Mr. Moore's Fourth Amendment claim in Count 2).

The parties agree that the term "person" in § 1983 includes municipalities and other local government units, such as the District of Columbia, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), but that a municipality "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *id.* at 691 (emphasis in original); Defs.' Mem. at 11; Pls.' Opp'n. at 9.  They also agree that to sustain their Section 1983 claim against the District, the plaintiffs must not only allege a predicate violation of some right, privilege, or immunity secured by the Constitution and laws of the United States, *see* 42 U.S.C. § 1983, but also "that the municipality's custom or policy caused the violation."  *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 123–24 (1992)); *see also Sheikh v. District of Columbia*, No. 14-316, 2015 U.S. Dist. LEXIS 112, at *23-24 (D.D.C. Jan. 5, 2015) (outlining the two-step inquiry for assessing a claim for municipal liability: "'First, the court must determine whether the complaint states a claim for a predicate constitutional violation.  Second, if so, then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation.'" quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)); Defs.' Mem. at 12; Pls.' Opp'n at 9.  A municipality's causation of the alleged constitutional violation "can be shown in several ways," including by showing that the municipality or one of its policy makers (1) explicitly adopted the policy that was the moving force of the constitutional violation; (2) knowingly ignored a practice that was consistent enough to constitute custom; or (3) failed to respond to a need in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations.  *Jones*, 634 F.3d at 601.  With respect to the last method of showing that a municipality caused and is liable for a constitutional violation under Section

1983, "[d]eliberate indifference 'is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations,' but did not act." *Id.* (quoting *Baker*, 326 F.3d at 1306 ); *see also Brown v. District of Columbia*, 514 F.3d 1279, 1284 (D.C. Cir. 2008) (allegations that "the District of Columbia sat idly by while the plaintiff['s] serious medical needs were ignored after plaintiff had informed them of his medical needs," was sufficient demonstration of deliberate indifference to state a claim that a custom or policy of the municipality caused the plaintiff's underlying Eighth Amendment constitutional violation); *Smith v. District of Columbia*, 413 F.3d 86, 101 (D.C. Cir. 2005) (upholding jury finding that District was liable under Section 1983 for deliberate indifference that shocks the conscience based on "reasonabl[e] infer[ence] that the District acted indifferently" due to lack of criteria for selecting and monitoring living programs for juvenile delinquents and "because it failed to react– at all—to" prior "incidents related directly to the program's deficiencies"); *Morgan v. District of Columbia*, 824 F.2d 1049, 1058-59 (D.C. Cir. 1987) (concluding that the jury could have found deliberate indifference where the jury could have reasonably inferred "that the District knew or should have known that its persistent method of operating the Jail increased the risk of violent harm to inmates").

The defendants do not challenge for purposes of this motion the constitutional violation predicate for Mr. Moore's claim that he was allegedly arrested without probable cause, in violation of the Fourth Amendment. *See generally*, Defs.' Mot. (not seeking summary judgment on Count 1, except as to Officer Cole). To the extent, that the defendants contend that the tackling of Ms. Moore does not constitute a Fifth Amendment substantive due process violation, the Court has already addressed and rejected that attack, given the standard applicable to evaluating this summary judgment motion, *supra* in Part III.A.2. Hence, for purpose of Counts 2

and 4, the plaintiffs have, for purposes of this summary judgment motion, provided sufficient evidence to satisfy the first condition of their Section 1983 claims against the District.

Nevertheless, the defendants contend that the plaintiffs are unable to sustain the second condition for their Section 1983 claims.  The parties agree that the plaintiffs could establish the prerequisite municipal custom or policy of deliberate indifference to unconstitutional conduct by showing "a pervasive pattern of similar constitutional violations," Defs.' Mem. at 13; Pls.' Opp'n at 12, but the defendants reject the sufficiency of the evidence proffered by the plaintiffs on this issue, Defs.' Mem. at 14-15.  Specifically, the plaintiffs intend to support their Section 1983 claims in Counts 2 and 4 against the District by relying, in substantial part, on evidence introduced at the 2011 trial of an unrelated case, *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183 (D.D.C. 2011), which concluded with a jury verdict for the plaintiff "just *one* week before the April 1, 2011 incident" at issue in this case.  Pls.' Opp'n at 9 (emphasis in original).[16] According to the plaintiffs, this evidence "regarding MPD's practice of arresting citizens for 'contempt of cop' without probable cause," *id.* at 10, "put the District on notice of its constitutional violations and its inadequate attempts to remedy and prevent those violations," *id.* at 12.

As summarized by the plaintiffs, this *Huthnance* evidence consists of (1) a November 18, 2003 report from the District of Columbia's Citizen Complaint Review Board entitled "Disorderly Conduct Arrests Made by Metropolitan Police Department Officers" ("2003 CCRB

---

[16] In *Huthnance*, the plaintiff sued the District and MPD officers for arresting her for "contempt of cop," "meaning the officers didn't have probable cause to believe she had committed any crime and instead arrested her merely because she had criticized the police."  *Huthnance*, 793 F. Supp. 2d at 188.  She alleged that the District knew or should have known about its officers' habits of doing so and failed to train them properly.  *Huthnance v. District of Columbia*, 722 F.3d 371, 375 (D.C. Cir. 2013).  After trial, the jury found certain of the defendant MPD officers liable for the torts of false arrest, assault and battery and for violating the plaintiff's First and Fourth Amendment rights, and the District liable for deliberate indifference to citizens' First and Fourth Amendment rights.  *Id.*

Report");[17] (2) the gap between the remedial measures the District represented it would take in response to the 2003 CCRB Report and the steps the District actually took; and (3) expert testimony regarding the inadequacy of MPD training and a study of disorderly conduct arrests in the District during the first half of 2005, which study concluded that over 34 percent of those arrests failed to state probable cause for arrest.  Pls.' Opp'n at 10-11.[18]  The plaintiffs posit that this evidence, together with additional evidence about the District's belated and "vague" training of MPD officers, shows "that the District had substantial evidence of the potential for constitutional violations related to arrests for contempt of cop without probable cause – thus establishing 'notice' – *and* that the failure of the District to adequately respond to this risk constitutes deliberate indifference to the rights of citizens," *id*. at 12, thereby "rais[ing] a genuine issue of material fact regarding the District's liability," *id*. at 14.

While not disputing the similarities between the *Huthnance* plaintiff's arrest in 2005 for disorderly conduct without probable cause and Mr. Moore's arrest for the same offense in 2011, the defendants contend that the *Huthnance* evidence cannot carry the plaintiffs' claims to a jury for two reasons.[19]  First, the defendants note the staleness of the underlying data presented in

---

[17] The 2003 CCRB Report discussed (1) its conclusions in four cases that "officers harassed citizens" by making "improper or unlawful disorderly conduct arrests," as well as an unspecified number of other complaints under investigation, and (2) the District's "high number of disorderly conduct arrests, combined with an arrest procedure" allowing resolution of the arrest upon payment of a $25 fine, and indicated these circumstances were "a warning sign of a larger problem with disorderly conduct arrests made by MPD officers."  Pls.' Opp'n, Ex. 7 at 2.  The 2003 CCRB Report recommended, *inter alia*, "additional instruction" to MPD officers to be implemented "immediately . . . through training at roll call or adding a lesson on disorderly conduct to annual in-service training attended by all officers."  *Id*. at 20.

[18] Two experts testified in the *Huthnance* trial about the 2005 study, *Huthnance*, 793 F. Supp. 2d at 200 ("Both experts testified about a study performed by Dr. James Ginger that found over 34% of disorderly conduct arrest reports from the first six months of 2005 failed to state probable cause for arrest."), but, as noted by the defendants, the plaintiffs do not explain how they would present this evidence at trial since they have not retained any experts, let alone the experts who presented this evidence at the *Huthnance* trial, to describe *any* study of disorderly conduct arrests in the District over *any* period of time.  *See* Defs.' Reply at 2-3.

[19] The defendants correctly point out that Ms. Moore's claim of excessive force in violation of the Fifth Amendment differs from the claims at issue in *Huthnance*.  Consequently, the plaintiffs' reliance on the *Huthnance* evidence as support for the District being on notice of a pattern of unconstitutional conduct by MPD officers regarding the use of excessive force is entirely misplaced.  In short, the Court concurs with the defendants that the plaintiffs have "presented absolutely no evidence of a widespread practice of Fifth Amendment violations similar to the one she

both the 2003 CCRB Report, which analyzed arrests between 2001 and 2003, and in the expert's

study, which considered police arrest reports generated in the first six months of 2005.

According to the defendants, the "five year gap" between the arrest data presented in the

*Huthnance* trial and Mr. Moore's arrest in this case leaves a "lack of evidence for that period"

that is "fatal" to plaintiffs' claims against the District.  Defs.' Mem. at 14.  The defendants

reason that since the *Huthnance* evidence "did not relate to any alleged false arrests after

2005…[it is] too remote in time to establish a custom or policy of deliberate indifference on the

part of the District that could conceivably give rise to Plaintiff Eric Moore's arrest in 2011."

Defs.' Reply at 2.

Second, the defendants argue that the District took affirmative steps to address "any

alleged problem related to disorderly conduct arrests" before the April 1, 2011 incident.  Defs.'

Mem. at 14.  Those steps included (1) offering in January, 2011, on-line training to every MPD

officer "related to the newly enacted disorderly conduct statute;" and (2) requiring, as a

component of annual in-service training for MPD officers during 2011, classroom training

"related to the disorderly statute," which training Officer Callahan completed three months

before the incident at issue in this case.  *Id.* at 15 (citing Defs.' Mot., Ex. 8 (Callahan Training

Record), ECF No. 28-8).  According to the defendants, "[b]ecause the District has responded

affirmatively to an alleged need for training, it cannot be found to have been deliberately

indifferent to a known problem."  *Id.*

The two reasons proffered by the defendants for challenging the plaintiffs' claims against

the District arguably undercut each other.  The timing gap between the 2003 CCRB report,

which recommended "immediate" training on disorderly conduct arrests, and "the training

---

alleges that she experienced."  Defs.' Reply at 4-5.  Consequently, the District is entitled to summary judgment on
Ms. Moore's Count 4.

initiated by the Metropolitan Police Department in 2011 related to the newly enacted disorderly

conduct statute," Defs.' Reply at 3, would seem to corroborate the plaintiffs' claim of deliberate

indifference by showing a delay of almost eight years before the District took steps to supply the

recommended training to address the "warning sign of a larger problem with MPD's disorderly

conduct arrests."  2003 CCRB Report, at 21.[20]  Moreover, at the time of the April 1, 2011

incident at issue in this case, only two of the officers involved had apparently received any of the

recommended training.  Defs.' Reply at 3 (citing Callahan and Sharpton Training Records for

January, 2011).  The plaintiffs argue that these circumstances show that the District "adopted a

policy of inaction or at least inadequate action in response to that risk of constitutional

violations."  Pls.' Opp'n at 14.

　　　Notwithstanding the force of the plaintiffs' argument, the Court is not persuaded that

reliance on the 2003 CCRB Report and a study of arrest data from part of 2005 is sufficient for a

reasonable jury to conclude that the District was deliberately ignoring a pattern of unjustified

disorderly conduct arrests between 2006 and 2011.  Notably, the record in *Huthnance* included

the study of disorderly arrest data from the same year and just shortly before the plaintiff's

disorderly conduct arrest that showed a disturbing pattern of such arrests without probable cause

in that time period.  *Huthnance*, 793 F. Supp. 2d at 200-01.  By contrast, the record before the

Court is bare of evidence that such a pattern continued over the next five years, let alone existed

around the time of the Mr. Moore's arrest, such that the District should have known about the

continuing constitutional violations by MPD officers.  Instead, as the defendants point out, the

plaintiffs would "seek to have the jury impermissibly speculate that a significant percentage of

---

[20] While discounting the adequacy of the District's response, the *Huthnance* Court noted that, after issuance of the 2003 CCRB Report, "the District improved its training materials and modified its arrest procedure to ensure that citizens were provided with written notice about the collateral forfeiture process and that arrestees sign an acknowledgment of their choice to forfeit collateral." *Huthnance*, 793 F. Supp. 2d at 200-01.

arrests for disorderly conduct between 2006 and 2011 were undertaken without probable cause."

Defs.' Reply at 2-3.

While "'a jury is entitled to draw a vast range of reasonable inferences from evidence, [it]

may not base a verdict on mere speculation.'" *United States v. Gaskins*, 690 F.3d 569, 578 n.3

(D.C. Cir. 2012) (quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990)).  The

plaintiffs apparently plan to invite the jury to infer that because of warnings made in 2003 by the

CCRB about disorderly arrests in the District, an issue which may have continued through the

first half of 2005, that the same problem continued unabated for the next five years.  This invited

inference crosses the line into speculation.  Even drawing all reasonable inferences in the

plaintiffs' favor, the absence of significantly probative evidence on which a jury could

reasonably find for the plaintiffs on this issue does not defeat summary judgment.  *See Anderson*,

477 U.S. at 249-50 ("If the evidence is merely colorable, or is not significantly probative, …

summary judgment may be granted.") (internal citations omitted).  Consistent with the

conclusion reached by other Judges on this Court, the *Huthnance* evidence simply does not

create a genuine issue of material fact about whether the District was on notice of, and

deliberately indifferent to, constitutionally defective disorderly conduct arrests at the time period

of the incident at issue, or even in the five years leading up to it.  *See, e.g.*, *Egudu v. District of

Columbia*, No. 12-1841, 2014 U.S. Dist. LEXIS 153423, at *17-18 (D.D.C. Oct. 29, 2014)

(finding "plaintiff's reliance on *Huthnance* is misplaced" since "even if the Court were to take

judicial notice of the evidence and the court's findings in *Huthnance*, that information would not

satisfy plaintiff's burden to show what was customary in the District in 2009" when the incident

at issue took place); *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133-34 (D.D.C. 2011)

(rejecting 2003 CCRB Report, which is "[o]ne study, seven years prior to Plaintiff's arrest," as

sufficient evidence to "show a persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers, [as]… caus[ing] the deprivation of constitutional rights plaintiffs experienced.") (internal quotations and citation omitted); *Robinson v. District of Columbia*, 965 F. Supp. 2d 90, 95 (D.D.C. 2013) (finding "that the 2003 CCRB Report did not put the District on notice of a custom or policy of constitutional violations such that municipal liability under Section 1983 can be imposed on the District.").[21]

Accordingly, the District is entitled to summary judgment on the plaintiffs' Section 1983 claims in Counts 2 and 4.

### C.      Challenges to Negligence Claims in Counts 12, 14, and 16

The plaintiffs assert three claims of negligence against the District, together with Lieutenant Alter, who is named as a defendant in two of those claims (Counts 12 and 16), and with Officer Callahan, who is named as a defendant in the third claim (Count 14).  The defendants seek summary judgment in their favor on all three of these negligence claims.  The challenges to these negligence claims are addressed *seriatim* below.

### 1.      Plaintiffs' Negligence Claims Against the District and Lieutenant Alter in Counts 12 and 16

Both plaintiffs allege that the District and Lieutenant Alter are liable for common law negligence leading to the mistreatment of Mr. Moore and Ms. Moore for failing properly to "hire, train, supervise, and fire if necessary, its employees in order to protect the public against reasonable dangers without would be likely to occur in absence of proper hiring, training, supervision, and firing."  SAC, ¶ 131 (Count 12 by Mr. Moore); *id*. ¶ 155 (Count 16 by Ms.

---

[21]The fact that the jury verdict in *Huthnance* was "handed down … just *one week* before the April 1, 2011 incident involving Plaintiffs," Pls.' Opp'n at 9, does not, as the plaintiffs argue, show that "the District should have been on notice that its officers were routinely arresting citizens without probable cause and merely for 'contempt of cop,'" *id.* at 10.  A trial regarding an incident that occurred in 2005 simply does not establish a pattern of unconstitutional conduct occurring around the date of the incident at issue here in 2011.

Moore).[22]  The defendants seek summary judgment on these negligence claims because, first,
"the record in this case is absolutely devoid of any evidence" regarding "negligent hiring,
supervision and retention;" and, second, "[a]s to their negligent training claims," the plaintiffs
"have failed to identify any expert who would testify at trial regarding the national standard of
care or the District's breach thereof."  Defs.' Mem. at 21- 22.[23]  The defendants' challenge to
these claims is only partially correct, as discussed below.

As support for their first argument challenging the negligent supervision claim, the
defendants contend that "there is insufficient evidence from which a jury could conclude that
[Lieutenant Alter] had an opportunity to prevent" the tackling of Ms. Moore or that he "was in
earshot of the conversation between Plaintiff Moore and Officer Callahan that gave rise to
Plaintiff's arrest," leaving him justified in relying on his subordinates' view of probable cause
for the arrest.  Defs.' Reply at 7.  The Court disagrees.

The law is well-settled that "[l]iability for negligent supervision arises when an
'employer knew or should have known its employee behaved in a dangerous or otherwise
incompetent manner, and that the employer, armed with that actual or constructive knowledge,
failed to adequately supervise the employee.'"  *Godfrey v. Iverson*, 559 F.3d 569, 571 (D.C. Cir.
2009) (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001)); *see also James
v. District of Columbia*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012) (to prevail on a claim of
negligent supervision, "the plaintiff must prove 'that the employer breached a duty to the

---

[22] The defendants' previous motion to dismiss these claims against the District was denied.  *See* Defs.' Mot. Partial
Dismissal of Am. Compl., ¶ 3, ECF No. 10; Minute Order (Mar. 8, 2013).
[23] In reply, the defendants correctly point out that the plaintiffs "do not proffer any evidence or advance any
argument in their opposition" as to why the plaintiffs' negligent hiring and retention claims should remain in the
case. Defs.' Reply at 6.  Indeed, the plaintiffs' opposition to this part of the defendants' motion refers in the caption
only to their "Claim for Negligent Training and Supervision," and discusses only whether expert testimony is
required in "police training cases" and whether "Lt. Alter, as the supervising officer, failed to adequately supervise
the officers under his command." Pls.' Opp'n at 20-21.  Consequently, the defendants' motion will be granted, as
conceded, as to the parts of Counts 12 and 16 referring to hiring and retention. *See* Local Civ. R. 7(b); *Wannall*,
2014 U.S. App. LEXIS 24547, at *5; *Buggs*, 293 F. Supp. 2d at 141.

plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff.'" quoting *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002)); *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007).

In this case, the parties do not dispute that the District's supervisory employee, Lieutenant Alter, was on the scene for the entire duration of the alleged incident.  Furthermore, Lieutenant Alter was sufficiently involved in the escalating altercation between the plaintiffs and the MPD officers that he was asked to speak or actually spoke, initially by telephone and subsequently in person, to Ms. Moore.  *See* Pls.' Resp. SMF ¶ 3 (noting disputed facts whether Lieutenant Alter refused to speak to Ms. Moore via telephone or, as Lieutenant Alter testified, did speak to her); Pls.' Opp'n at 7 (citing Ms. Moore's deposition testimony that "Ms. Moore pleaded with Lt. Alter to control his officers").  In view of Ms. Moore's communications or efforts to communicate with Lieutenant Alter, a jury may agree with the plaintiffs' version of events that Lieutenant Alter was not "paying close attention to Officer Callahan and Mr. Moore during the assault and arrest," but should have been. Pls.' Opp'n at 21; s*ee also District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (upholding award against the District for negligent supervision where "the jury could reasonably find that the District, through Sergeants [at scene of incident] was negligent in its duty to supervise [arresting officer] and to protect [plaintiff] from wrongful arrest" since "the sergeants at the scene should have recognized that the investigation was inadequate and that the arrest was unlawful").  Resolution on summary judgment of these disputed circumstances regarding Lieutenant Alter's precise location and involvement over the course of the unfolding altercation would be wholly inappropriate. Therefore, the defendants' motion for summary judgment as to the parts of Counts 12 and 16 alleging negligent supervision is denied.

Second, the defendants argue that the plaintiffs' "fail[ure] to present expert evidence of the relevant standards of care regarding police training" is fatal to their ability to "establish that the District breached a standard of care regarding training." Defs.' Mem. at 22.[24] The plaintiffs do not dispute that they have retained no expert to offer testimony about the standard of care for training, but assert that they do not need an expert in cases where "a lay person could reasonably conclude that the District or police officers had failed to meet its standard of care." Pls.' Opp'n at 20. Indeed, "[o]rdinarily, the applicable standard of care is the traditional reasonable person standard, which the jury can ascertain . . . without the aid of expert testimony." *Robinson v. Wash. Metro. Area Transit Auth.*, No. 13-7077, 2014 U.S. App. LEXIS 23948, at *10 (D.C. Cir. Dec. 19, 2014) (internal quotations and citations omitted).

The necessity for expert testimony to establish the standard of care in negligence actions is limited to when "'the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson.'" *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)) (internal quotation marks omitted); *Linares v. Jones*, 551 F. Supp. 2d 12, 19 (D.D.C. 2008). Courts must assess whether the pertinent standard of care owed by the alleged tortfeasor in the factual context presented is "'within the realm of common knowledge and everyday experience'" of the jurors or requires the guidance of expert testimony. *Arnold & Porter*, 756 A.2d at 433 (quoting *District of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982)).

In negligent supervision cases, courts in this Circuit have held that expert testimony is not required to establish standard of care, at least when "supervisory police officers were

---

[24] The defendants do not argue that expert testimony is required to support the negligent supervision part of Counts 12 and 16. *See generally* Defs.' Mem. and Defs.' Reply.

physically present on the scene and were negligent in supervising the subordinate officer during

that officer's altercation with the plaintiff." *Flythe v. District of Columbia*, 994 F. Supp. 2d 50,

69 (D.D.C. 2013) (collecting cases).  For example, in *Godfrey*, the plaintiff claimed that the

bodyguard of the defendant basketball star beat up the plaintiff, who then sued for negligent

supervision.  559 F.3d at 571.  The D.C. Circuit held that no "expert assistance" was needed to

"establish the standard of care for an individual who is present while his personal bodyguard,

acting on his behalf in clearing a room in a nightclub, beats a customer and causes significant

injuries."  *Id.* at 573.  The Court stressed that "the individual with the supervisory authority []

was *present* when his employee (his personal bodyguard []) committed the tortious acts," a fact

which, "together with the duration of the melee," permitted a jury to find, without the aid of

expert testimony, both that the supervisor "had the ability to supervise or control" the

employee's behavior and to establish the standard of care.  *Id.*

    More recently, the D.C. Circuit expressly rejected the District's argument that expert

testimony was required for a plaintiff to prevail on a common-law negligent supervision claim.

In *Wesby v. District of Columbia*, the Court affirmed the grant of summary judgment on a

negligent supervision claim to plaintiffs, who had been arrested without probable cause for

unlawful entry and disorderly conduct while at a house party to which they had been invited by

"Peaches," whom the plaintiffs reasonably believed was the lawful occupant.  765 F.3d at 31.

The District argued "that it was entitled to summary judgment on this claim because the

Plaintiffs failed to present expert testimony regarding the standard of care."  *Id.* at 30.  The Court

"disagree[d]," explaining that "the fact that the supervising official was on the scene and directed

the officers to make the unlawful arrests distinguishes this case from those in which expert

testimony has been required."  *Id.*

By contrast to negligent supervision claims, however, expert testimony has been required for claims of negligent training of police personnel. *See, e.g.*, *Flythe v. District of Columbia*, 994 F. Supp. 2d at 72 n.15 (D.D.C. 2013) (granting summary judgment to District as to negligent hiring and training (as opposed to supervising) "[b]ecause the plaintiff has not produced any evidence that the District was negligent in hiring or training . . . and did not proffer expert testimony on the issue"); *Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 207 (D.D.C. 2008) (granting summary judgment to District on negligent training claim since "[a]bsent expert testimony on the standard of care relative to police training, the plaintiff cannot succeed on her claims because no jury could conclude that the District was negligent in training [officer]"); *Linares*, 551 F. Supp. 2d at 19-20 (granting summary judgment to District on negligent supervision and training claim due to "[p]laintiff's failure to proffer the testimony of an expert witness"); *Robinson v. District of Columbia*, No. 03-1455, No. 03-1456, 2006 U.S. Dist. LEXIS 68122, at *29 (D.D.C. Sept. 21, 2006) (granting summary judgment to District on negligent training claim since "[w]ithout expert testimony on recognized standards for training and supervising police officers generally, a jury cannot find the District of Columbia negligent in training and supervising" defendant MPD officers); *Griggs v. Wash. Metro. Area Transit Auth.*, No. 99-1552, 2002 U.S. Dist. LEXIS 18413, at *14 (D.D.C. Sept. 30, 2002) (requiring expert testimony on standards of care for police canine and joint operations between MPD and transit police and deviation from those standards); *Young v. District of Columbia*, 752 A.2d 138, 146 (D.C. 2000) (concluding "that the level of training to which the District should be held in training police officers in [landlord-tenant disputes] is not within the common knowledge of lay persons"); *Etheredge v. District of Columbia*, 635 A.2d 908, 917-18 (D.C. 1993) (concluding that although the plaintiff asserted "that the District itself was negligent in connection with the

hiring, training, and supervision of Officer . . . [t]he jury was never made aware, by expert testimony, of 'recognized standards concerning such training'" and because of this "no reasonable juror could have found negligence on the part of the District in the hiring, training or supervision of Officer"); *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987 )("the question whether the District was negligent in failing to train its police officers adequately with regard to dealing with mentally disturbed persons or persons under the influence of drugs could be answered only if the jury was made aware of recognized standards concerning such training"); *District of Columbia v. White*, 442 A.2d 159, 165 (D.C. 1982) (reversing the trial court's decision not to require expert testimony on a negligent training claim because the absence of such evidence "left the jury with unanswerable questions concerning the scope of the District's training program and the format, content and frequency of an adequate training and retraining program").

Notwithstanding the substantial weight —and unanimity — of the case law confirming the necessity of expert testimony to prevail on a claim that the District negligently trained its police officers, the plaintiffs insist that because "the District waited several years before it updated its training in response to evidence collected and presented in *Huthnance* [,] [t]his fact alone could show negligence in training officers by the District." Pls.' Opp'n at 21.  The Court is not persuaded.  The myriad of subjects to be covered in training (e.g., ranging from firearms training and use of force to completing paperwork), the specific content of training on these subjects, the frequency of training (e.g., annually or more or less frequently), and manner of training (e.g., in person, online, as a group or individually) for police officers in order to meet effectively a national standard of care and assess whether the training provided fell short of that standard, is simply beyond the ken of the average lay juror.  Absent expert testimony about "the

format, content and frequency of an adequate training and retraining program," the jury will be

"forced to engage in speculation," *District of Columbia v. White*, 442 A.2d at 165, about whether

the District's training deviated from the standard of care and whether imposition of liability for

negligent training was warranted.  In sum, the plaintiffs have not noticed any expert witness to

establish the national standard of care for the training of police officers and the time for

discovery is closed.  Thus, the plaintiffs are incapable, as a matter of law, of proving their

negligent training claim against the District.

Accordingly, defendants' motion for summary judgment on Counts 12 and 16 is denied

as to the negligent supervision and granted as to negligent training parts of these claims.

### 2.   Ms. Moore's Negligence Claim Against District and Officer Callahan in Count 14

Ms. Moore alleges, in Count 14, against the District and Officer Callahan, that even if

Officer Callahan had a right to arrest Mr. Moore, he "had a duty to exercise at least ordinary care

and to use the minimal amount of force necessary" in doing so, SAC ¶ 144, but that he

negligently breached this duty "when he carelessly tackled Ms. Moore to the ground, landing on

top of her body, using excessive, unnecessary, and gratuitous force," *id*. ¶ 145.  She further

alleges that the District "is liable for the actions taken by Officer Callahan pursuant to the

doctrine of respondeat superior." SAC ¶ 147.

The defendants seek summary judgment on this claim because the evidence developed in

the deposition of Ms. Moore "is insufficient to establish a negligence claim."  Defs.' Mem. at

18.[25]  Specifically, Ms. Moore "has testified that she was assaulted and battered by Officer

Callahan who, she claims, intentionally tackled her to the ground."  *Id*. at 20 (citing Ms. Moore

---

[25] This challenge to Count 14 is a replay of the defendants' prior Motion for Partial Dismissal of Ms. Moore's negligence claim against the District and Officer Callahan on grounds that the facts alleged in the Amended Complaint "cannot support a claim for negligence."  Defs.' Mem. Supp. Mot. Partial Dismissal at 12, ECF No. 10; Defs.' Mot. Partial Dismissal of Am. Compl., ¶ 4, ECF No. 10.  Despite their persistence, the defendants' instant challenge fares no better now than when the Court denied their motion to dismiss.  Minute Order (March 8, 2013).

Dep. at 26-27).   In light of this testimony of intentional conduct by Officer Callahan, the

defendants contend that Ms. Moore may not also claim that "she was inadvertently bumped in

the course of officers arresting Plaintiff Eric Moore."   *Id*.  ("Defendants submit that a police

officer cannot negligently tackle someone to the ground because the act of tackling is one

requiring intentional conduct.").   Based on this reasoning, the defendants posit that Officer

Callahan and the District are entitled to summary judgment on Ms. Moore's alternative

negligence claim.   The defendants are plainly incorrect.

         While, as a legal matter, "[t]here is no such thing as a negligent assault," *Sabir v. District

of Columbia*, 755 A.2d 449, 452 (D.C. 2000), a plaintiff may assert alternative theories of

intentional and negligent conduct in separate claims in the same pleading.   The D.C. Court of

Appeals has made this clear, stating, "[a]n individual who has been injured by a District police

officer may sue under one or more common law theories of legal liability such as assault and

battery or negligence, as [plaintiff] did in the instant case." *District of Columbia v. Chinn*, 839

A.2d 701, 705 (D.C. 2003).   Moreover, "where there is sufficient evidence to submit to a jury the

question of assault and battery [that is, where a reasonable jury could conclude that excessive

force was used] there *may* be, on the facts of a particular case, sufficient evidence to submit the

question of negligence as well," since "[b]oth issues 'involve an inquiry into the reasonableness

of the police officer's actions.'" *Id*. at 706-07 (internal quotation marks omitted) (emphasis in

original).   Thus, claims for assault and battery and for negligence may be pled separately in the

same pleading and submitted together to the jury, so long as the negligence claim is "based upon

at least one factual scenario that presents an aspect of negligence apart from the use of excessive

force itself and violative of a distinct standard of care." *Scales v. District of Columbia*, 973 A.2d

722, 731 (D.C. 2009) (quoting  *Smith v. District of Columbia*, 882 A.2d 778, 792 (D.C. 2005)

(quoting *Chinn*, 839 A.2d at 711)); *see also Dormu v. District of Columbia*, 795 F. Supp. 2d 7,

30 (D.D.C. 2011) (recognizing under District of Columbia law that a plaintiff may

simultaneously assert claims for negligence and assault and battery based on excessive force

when "the negligence claim is: (1) distinctly pled; (2) based upon at least one factual scenario

that presents an aspect of negligence apart from the use of excessive force itself; and (3) violative

of a distinct standard of care.") (internal quotations and citations omitted).[26]

In this case, the plaintiffs allege that the defendant MPD officers exchanged signals as

part of Officer Callahan's coordinated plan to tackle, intentionally, both plaintiffs. Pls.' Opp'n at

17.  Yet, the defendant MPD officers have testified in depositions about alternative versions of

what occurred, including that Ms. Moore "initiated contact" with Officer Callahan; that Mr.

Moore "knocked his own mother down;" or that "everyone simply fell after a struggle."  Pls.'

Add'l SMF ¶ 2.  Given these disputed versions of the event, Ms. Moore is entitled to present the

jury with her alternative negligence claim that she was simply in Officer Callahan's way, rather

than the target of the tackle, but the manner in which Officer Callahan executed the arrest of Mr.

Moore used an unreasonable amount of force, resulting in injury to Ms. Moore.  It is well within

the purview of the jury to determine which version of the event is to be believed.  Accordingly,

the defendants' motion for summary judgment on Count 14 is denied.

---

[26] The defendants cite to *Sabir v. District of Columbia*, 755 A.2d 449 (D.C. 2000) and *Maddox v. Bano*, 422 A.2d
763 (D.C. 1980), for the proposition "that a plaintiff cannot claim that an intentional act also was negligent," Defs.'
Mem. at 20, but these cases plainly "do not preclude separate causes of action where the plaintiff has pled and
established separate and distinct claims." *Chinn*, 839 A.2d at 710.  The defendants' reliance on *Chinn* is likewise
misplaced.  There, the court vacated a negligence verdict since the plaintiff's claim, though labeled "negligence,"
was based on allegations "not reflect[ing] negligence, but rather an intentional tort with a conclusory allegation of
negligence." *Chinn*, 839 A.2d at 711.  By contrast, here, the plaintiffs have adequately pleaded a negligence claim
in Count 14.

**IV.     CONCLUSION**

For the foregoing reasons, the defendants' Motion for Partial Summary Judgment is granted in part and denied in part.  Specifically, the defendants are entitled to summary judgment on the plaintiffs' claims in Counts 2, 4, 10, and the parts of Counts 12 and 16 claiming common law negligence in hiring, training and retention.  The defendants' Motion for Partial Summary Judgment is denied in all other respects, including as to Counts 1, 3, 14 and the parts of Counts 12 and claiming common law negligence in supervision.

The parties are directed to appear for a pre-trial conference on April 14, 2015 and be prepared for trial in this matter shortly thereafter.

An order consistent with this Memorandum Opinion and setting out the schedule to control further proceedings in this matter will be contemporaneously entered.

Date:  February 5, 2015

_____
BERYL A. HOWELL
United States District Judge